David P. Claiborne (ISBN: 6579)
SAWTOOTH LAW OFFICES, PLLC
Golden Eagle Building
1101 W. River Street, Suite 110
Boise, Idaho 83702
Telephone:  (208) 629-7447
Facsimile:  (208) 629-7559
david@sawtoothlaw.com
*Counsel for Plaintiff*

Yaakov M. Roth*
Harry S. Graver*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 879-3939
yroth@jonesday.com
hgraver@jonesday.com

Samuel V. Lioi*
Matthew R. Modderman*
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone:  (216) 586-3939
slioi@jonesday.com
mmodderman@jonesday.com

*Pro Hac Vice* Forthcoming

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BLUERIBBON COALITION, | Case No.:_____ |
| *Plaintiff,* | |
| *v.* | **MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION** |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States; DEBRA A. HAALAND, in her official capacity as Secretary of the Interior; THOMAS J. VILSACK, in his official capacity as Secretary of Agriculture; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; CHARLES F. SAMS III, in his official capacity as Director of the National Park Service; and, RANDY MOORE, in his official capacity as Chief of the United States Forest Service, | |
| *Defendants.* | |

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .............................................................................................ii

INTRODUCTION.............................................................................................. 1

BACKGROUND................................................................................................ 3

      A.    The Permit Regime ............................................................... 3

      B.    The BlueRibbon Coalition ......................................... 4

LEGAL STANDARD......................................................................................... 5

ARGUMENT..................................................................................................... 5

I.     BLUERIBBON IS LIKELY TO SUCCEED ON THE MERITS....................... 5

      A.    BlueRibbon Has Standing to Challenge the Permit Regime.................... 5

      B.    The Permit Regime Violates the First Amendment................................. 8

      C.    The Appropriate Remedy is Facial Relief................................ 18

II.    THE EQUITABLE FACTORS FAVOR BLUERIBBON ................................. 20

CONCLUSION ................................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. I ................................................................................................*passim*

**CASES**

*Aptive Env't, LLC v. Town of Castle Rock,*
959 F.3d 961 (10th Cir. 2020) ........................................................................ 12

*Ark. Writers' Project, Inc. v. Ragland,*
481 U.S. 221 (1987) ........................................................................................ 16

*Bantam Books, Inc. v. Sullivan,*
372 U.S. 58 (1963) .......................................................................................... 8

*Berger v. City of Seattle,*
569 F.3d 1029 (9th Cir. 2009) ..................................................................... 8, 15

*Boardley v. U.S. Dep't of Interior,*
615 F.3d 508 (D.C. Cir. 2010) ........................................................... 10, 15, 17

*California v. Azar,*
911 F.3d 558 (9th Cir. 2018) ........................................................................... 5

*Citizens United v. Fed. Election Comm'n,*
558 U.S. 310 (2010) ....................................................................................... 11

*City of Cincinnati v. Discovery Network, Inc.,*
507 U.S. 410 (1993) .................................................................................. 13, 15

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach,*
657 F.3d 936 (9th Cir. 2011) ......................................................................... 14

*Cuviello v. City of Vallejo,*
944 F.3d 816 (9th Cir. 2019) ......................................................................... 15

*Dex Media W., Inc. v. City of Seattle,*
  696 F.3d 952 (9th Cir. 2012) ........................................ 9

*DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.,*
  196 F.3d 958 (9th Cir. 1999) ........................................ 17

*Elrod v. Burns,*
  427 U.S. 347 (1976) ........................................ 20

*Epona, LLC v. Cnty. of Ventura,*
  876 F.3d 1214 (9th Cir. 2017) ........................................ 19

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.,*
  82 F.4th 664 (9th Cir. 2023) ........................................ 6

*Foti v. City of Menlo Park,*
  146 F.3d 629 (9th Cir. 1998) ........................................ 13

*Free Enter. Fund v. PCAOB,*
  561 U.S. 477 (2010) ........................................ 19

*IMDb.com Inc. v. Becerra,*
  962 F.3d 1111 (9th Cir. 2020) ........................................ 9

*Immigrant Legal Res. Ctr. v. Wolf,*
  491 F. Supp. 3d 520 (N.D. Cal. 2020) ........................................ 20

*Junior Sports Magazines Inc. v. Bonta,*
  80 F.4th 1109 (9th Cir. 2023) ........................................ 5, 20

*Kaahumanu v. Hawaii,*
  682 F.3d 789 (9th Cir. 2012) ........................................ 5, 8, 10, 13, 19

*Klein v. City of San Clemente,*
  584 F.3d 1196 (9th Cir. 2009) ........................................ 20

*Knox v. Brnovich,*
  907 F.3d 1167 (9th Cir. 2018) ........................................ 19

*Kwong v. Bloomberg,*
  723 F.3d 160 (2d Cir. 2013) ............................................................ 16

*Minn. Voters All. v. Mansky,*
  138 S. Ct. 1876 (2018) ..................................................................... 18

*Murdock v. Pennsylvania,*
  319 U.S. 105 (1943) ......................................................................... 16

*Price v. Barr,*
  514 F. Supp. 3d 171 (D.D.C. 2021) ................................................. 13

*Price v. Garland,*
  45 F.4th 1059 (D.C. Cir. 2022) ........................................................ 13

*Project Veritas v. Schmidt,*
  72 F.4th 1043 (9th Cir. 2023) ................................................... 5, 9, 17

*S.O.C., Inc. v. Cnty. of Clark,*
  152 F.3d 1136 (9th Cir. 1998) .......................................................... 12

*Sammartano v. First Jud. Dist. Ct.,*
  303 F.3d 959 (9th Cir. 2002) ........................................................... 18

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011) ......................................................................... 12

*Spirit of Aloha Temple v. Cnty. of Maui,*
  49 F.4th 1180 (9th Cir. 2022) .......................................................... 18

*Tschida v. Motl,*
  924 F.3d 1297 (9th Cir. 2019) .......................................................... 10

*Tucker v. Cal. Dep't of Educ.,*
  97 F.3d 1204 (9th Cir. 1996) ........................................................... 18

*Twitter, Inc. v. Garland,*
  61 F.4th 686 (9th Cir. 2023) ............................................................ 11

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*,
    536 U.S. 150 (2002) ................................................................ 8

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .............................................................. 5, 20

## STATUTES

16 U.S.C. § 460*l*-6d ...................................................................... 3

54 U.S.C. § 100905 ....................................................................... 3

*Commercial Filming Fee*, Pub. L. 106-206, 114 Stat. 314 (2000) ......................................... 3

## OTHER AUTHORITIES

43 C.F.R. § 5.4 ...................................................................... 10, 11

43 C.F.R. § 5.12 ..................................................................... 10, 11

*Commercial Filming and Similar Projects and Still Photography Activities*,
    78 Fed. Reg. 52,087 (Aug. 22, 2013) .............................................. 14

*U.S. Forest Serv. Handbook* § 2709.11 (Sept. 18, 2008) ......................................... 10

## INTRODUCTION

The Government has created a permitting scheme that stretches across almost every inch of public land, and functions as a prior restraint on core constitutional speech. This regulatory scheme is as unlawful as it is sprawling. This Court should enjoin it.

Today, any person engaged in "commercial filming" on public lands must first obtain a federal permit, and pay a number of fees for the privilege. But the Government defines "commercial filming" as broad as possible—*any* video that at *any* point generates *any* income, however small. As a result, this Permit Regime has a breathtaking scope, and one backed by criminal sanction to boot. Under the Regime, anyone who wants to film on public lands and generate any income from that video—for instance, an activist who wants to film herself on her iPhone in a national park, and post that video to a monetized social media page—must first get permission from the Government to speak.

Practically speaking, the Permit Regime is nothing short of suppressive for scores of speakers, and stores of speech. Obtaining a permit is costly—both in terms of the hours needed to navigate the Regime's many requirements, and the dollars needed to satisfy its many fees. More, with respect to spontaneous speech, the Regime is outright silencing, given it ordinarily takes weeks for a "commercial" filmmaker to get a permit.

Plaintiff's story lays this bare. BlueRibbon Coalition is a non-profit focused on protecting public access to public land. As part of this mission, BlueRibbon depends on filming to get out its message. Its films are not the stuff of Tinseltown—they involve little more than a smartphone, GoPro, or other handheld device. But their videos are

core First Amendment speech, covering issues of public land management and public policy; and for those videos to be effective, it is important that they showcase the actual lands they are discussing. The Regime, however, prevents this. Because BlueRibbon generates *some* income from its videos (by way of fundraising, social media, and the like), it must obtain a permit. But it cannot afford to do so, given the Regime's costs. At the same time, it also cannot afford to forego any income from its videos, because that money *funds* its ability to film (*i.e.*, speak). The result has been to simply stop filming.

The Permit Regime's system of suppression is unconstitutional. Foremost, the Regime triggers (and flunks) strict scrutiny, because it is content-based; the Regime not only targets one disfavored class of filmmakers ("commercial"), but also excludes one favored class from its reach (the press). Additionally, the Regime fails under even more forgiving standards. The Regime suppresses far more speech than necessary to advance any interest, and fails to make any real effort at tailoring its scheme to its asserted goals.

At bottom, the story of the Permit Regime is one of a scheme that failed to keep up with the times. While the Government has long regulated some commercial filming on public lands, these programs were crafted to an era when filming meant large-scale crews and equipment. In failing to adapt these regulations to the era of smartphones, the Government has inadvertently created a dragnet for massive amounts of otherwise protected speech. This is not to say that the Government cannot draft a narrow scheme regulating Hollywood filming operations on public lands. But it is to say that the current Permit Regime is anything but, and its clear excesses run afoul of the First Amendment.

## BACKGROUND

### A.    The Permit Regime.

In 2000, Congress passed, and President Clinton signed, Public Law 106-206. That law—which has now been split into two statutes, one for NPS lands, the other for BLM and USFS lands—set about the Permit Regime now at issue.  As relevant, the statutes (which are identical in all material respects) require the Secretaries of Interior and Agriculture to "require a permit" and "establish a reasonable fee for commercial filming activities" in the lands they manage.  54 U.S.C. § 100905(a)(1); 16 U.S.C. § 460*l*-6d(a)(1).  The statutes do not define what constitutes "commercial filming."  But they do specify that any fees should create a "fair return" (*i.e.*, profit) for the United States.

The Departments of Interior and Agriculture soon developed their permitting programs, and implemented them through a suite of substantively identical regulations (herein, the "Permit Regime").  Three features of the Permit Regime are necessary to understanding its constitutional infirmities.  *First*, the Regime defines "commercial filming" as *any* filming that generates income, and requires a permit for *all* such filming. Compl. ¶¶ 38-39 (collecting cites).  *Second*, complying with the Regime is costly and cumbersome; it is replete with fees, paperwork, and bureaucratic delay.  *Id.* ¶¶ 40-42. *Third*, the Regime singles out one favored class of speech:  The press.  For the news media (at least as labeled by the Government), the Regime's many burdens do not apply.

Violating the Permit Regime is also no small deal.  It is a *criminal* offense.  And it is one that the Government has not been shy to prosecute.  *Id.* ¶ 48 (collecting cases).

**B.     The BlueRibbon Coalition.**

The BlueRibbon Coalition is an Idaho-based 501(c)(3) that has worked to protect access to public lands through litigation, advocacy, educational initiatives since 1987.  It is a membership-based organization, with thousands of members across all fifty states.

The Permit Regime has dramatically harmed BlueRibbon, its members, and their ability to speak.  Here too, three points are necessary to understanding this challenge. *First*, filming on public lands is critical to BlueRibbon's mission, as well as the businesses of many of its members.  They depend on such filming to get out their message (which often involves messages critical of federal land management policy), and to fund it (through monetized social media pages, solicitations, ads, and more).  *See, e.g.*, Compl. ¶ 57.  *Second*, the film operations at issue are bare bones:  They typically involve nothing more than a smartphone, GoPro, or other handheld device.  *See, e.g., id.* ¶¶ 59, 83, 104. *Third*, because BlueRibbon (and some of its members) generate *some* income from their videos, they are subject to the Permit Regime.  But as explained below and throughout the complaint, they cannot afford to acquiesce to its terms, nor can they afford to forego generating any income from their videos (which funds them in the first place).  The consequence has been that BlueRibbon and its members have refrained from filming, or have materially modified their filming—or as the First Amendment puts it, speaking.

Given this suppression, BlueRibbon filed suit in this Court on November 15, 2023, challenging the Permit Regime's capacious regulations.  BlueRibbon now seeks a preliminary injunction in order to restore its and its members' First Amendment rights.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The first factor—likelihood of success on the merits—is the most important.  *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018).  "This is especially true for constitutional claims, as the remaining *Winter* factors typically favor enjoining laws thought to be unconstitutional." *Junior Sports Magazines Inc. v. Bonta*, 80 F.4th 1109, 1115 (9th Cir. 2023).

## ARGUMENT

## I.   BLUERIBBON IS LIKELY TO SUCCEED ON THE MERITS.

### A.   BlueRibbon Has Standing to Challenge the Permit Regime.

There is no doubt that the act of filming is "protected speech" under the First Amendment.  *Project Veritas v. Schmidt*, 72 F.4th 1043, 1055 (9th Cir. 2023).  And there is similarly no doubt that when a "permitting system" causes a person to "decline to speak" or "modify their speech," that person has standing to bring a constitutional challenge against such a system.  *Kaahumanu v. Hawaii*, 682 F.3d 789, 796 (9th Cir. 2012) (tenses modified).  In this case, the Permit Regime has broadly affected the ability of BlueRibbon and its members to speak; time and again, it has forced them silent, or has at minimum modified how they spoke.  Thus, on its own behalf as well as on behalf of

its members, BlueRibbon has standing to challenge the Regime.  *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 681 (9th Cir. 2023).

    **1.**    Begin with BlueRibbon.  As Executive Director Ben Burr explains, filming is essential to BlueRibbon's ability to further its mission:  It is an indispensable tool for them to get out their message, educate the public, and shape the debate surrounding issues of public land management.  *See, e.g.*, Compl. ¶ 57.  Filmmaking—and in particular, placing their films on social media—is also essential to BlueRibbon's ability to fund its mission.  *Id.* ¶¶ 60-61.  Whether it is through direct fundraising solicitations, sweepstakes, promotions, or monetized pages, BlueRibbon generates income from its videos—income that in turn pays for their ability to speak in the first place.  *Id.* ¶ 64.

    Because BlueRibbon generates *some* income from its videos, its videos are subject to the Permit Regime.  *Id.* ¶ 70; *see also* Compl. Ex. 10.  And that has come with huge consequences for BlueRibbon's ability to speak.  BlueRibbon cannot afford to acquiesce to the Permit Regime—it cannot afford the staff time for navigating its many cumbersome demands, and it cannot afford to pay regular fees every time it wants to film on public land.  Compl. ¶¶ 65-66.  Moreover, *even if* BlueRibbon could shoulder these burdens, that'd be no help for some of the group's most important speech:  As Ben details, much of BlueRibbon's content comes as part of NEPA processes, which almost always have a limited comment-window (typically, 30 days) that is dwarfed by the time required to obtain a federal permit (typically, 5-to-6 weeks).  *Id.* ¶¶ 67-68.

The upshot:  If BlueRibbon wants to generate any income from its videos, it cannot film on public lands without getting a permit; but BlueRibbon cannot afford to get a permit, nor afford to fund its filming operations, without generating income from its videos.  The result:  BlueRibbon has had to stop filming on public lands.  *Id.* ¶ 70.

But for the Permit Regime, BlueRibbon has a number of concrete and specific plans to film on federal public lands.  *Id.* ¶ 74.  Until then, however, BlueRibbon will continue to have to modify its speech—for instance, filming from Ben's house rather than on the lands that he is discussing, *id.* ¶ 71—or just refrain from speaking at all.

**2.**     So too for BlueRibbon's members.  Kyle Brothersen and Nathan Riddle, for instance, both have small businesses that revolve around motorized recreation and public lands.  Kyle runs a YouTube channel that (among other things) documents him riding dirt-bikes on public lands, *id.* ¶¶ 81-82; Nathan operates a website that includes videos of himself and others enjoying motorized access to public land, *id.* ¶¶ 100-01.

To fund their businesses—and in turn, their speech—Kyle and Nathan have both "monetized" their videos (*i.e.*, they have checked a box on YouTube, giving them a share of ad-revenue).  As a result, Kyle and Nathan's videos are both subject to the Regime.  And as with BlueRibbon, this has been deeply harmful to their ability to speak.

Neither Kyle nor Nathan can afford to comply with the Permit Regime; they do not have the money to pay its fees, nor the time to navigate its byzantine requirements. *Id.* ¶¶ 92-93, 112-13.  And neither Kyle nor Nathan have any appetite for violating it. Both have been threatened by federal agencies for videos allegedly violating the Regime,

including one episode where someone at USFS said Kyle might be on the hook for *one million dollars* as a result of a single video.  *Id.* ¶¶ 89-90, 108-10.  In light of this specter of enforcement—and given their inability to comply with the Permit Regime—Kyle and Nathan have instead gone with their only option:  Stop speaking.  *Id.* ¶¶ 90, 110.

As with BlueRibbon, both Kyle and Nathan have concrete and specific plans for filming that are currently being shelved because of the Regime.  *Id.* ¶¶ 90, 111.  And as with BlueRibbon, they too have standing to challenge the scheme keeping them quiet.

### B.    The Permit Regime Violates the First Amendment.

As Plaintiff's stories illustrate, the Permit Regime works as a serious and effective prior restraint on speech.  Such a restriction "bear[s] a heavy presumption against its constitutional validity."  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).  Even when issued promptly and at no cost (neither of which is true here), requiring permits for speech "constitutes a dramatic departure from our national heritage and constitutional tradition."  *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165-66 (2002); *see also Berger v. City of Seattle*, 569 F.3d 1029, 1037-38 (9th Cir. 2009).

In so many words, it is passing rare that a permit scheme where Americans must ask the Government for permission to speak will survive constitutional scrutiny; all the more so when such speech often *concerns* and is *critical of* the Government.  And this case is far from the exception.  Rather, the Permit Regime fails every available tier of scrutiny.

1.    **Speech.**  Where a federal law regulates expression on federal land, courts first ask whether the expression is "speech" under the First Amendment.  *Kaahumanu,*

8

682 F.3d at 798.  Here, as explained, it is black-letter law in the Ninth Circuit that filming activity is protected speech.  *See, e.g.*, *Project Veritas*, 72 F.4th at 1055.  But one further point bears emphasis:  While the Permit Regime styles itself as regulating "commercial filmmaking," the Regime goes well beyond "commercial speech," in the doctrinal sense.

The Supreme Court has held "commercial speech" is at times entitled to lesser constitutional protections than ordinary speech.  But the Court has been equally clear that "commercial speech" is *not* simply anything that earns a buck; books or magazines do not receive dampened protection if sold for profit, nor is a political speech any less at the heart of the First Amendment when the speaker receives an honorarium.  *See, e.g.*, *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 960 (9th Cir. 2012).  "Commercial speech," constitutionally speaking, is instead speech that "does no more than propose a commercial transaction."  *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1122 (9th Cir. 2020).

As the above makes clear, the Permit Regime reaches far past this narrow ambit to regulate core First Amendment expression.  For instance, the bulk of BlueRibbon's content concerns matters of policy, government, and public land management.  *See, e.g.*, Compl. ¶ 58.  Kyle uses his videos to discuss everything from politics to family to faith, all from the perspective of someone who finds himself while riding along public lands.  *See, e.g.*, *id.* ¶ 82.  And the same is true for Nathan, who uses his videos to showcase peoples' stories, and the importance of preserving motorized access to public lands.  *See, e.g.*, *id.* ¶ 102.  None of this is "commercial speech"; it all is traditional expression.

2.    **Forum.**  If a federal law regulates speech, the next question is whether it does so in a public versus non-public forum.  *Kaahumanu*, 682 F.3d at 799.  Here, the Permit Regime—which covers all NPS, BLM, and USFS land—plainly regulates speech in public forums.  Compl. ¶¶ 130 (collecting sources for NPS), 131 (BLM), 132 (USFS).

As the D.C. Circuit has explained, where (as here) a plaintiff brings a facial challenge to a permitting scheme, and that scheme reaches at least *some* speech in at least *some* public forums, that is sufficient to hold that the scheme should be analyzed under the framework for public forums.  *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 515 (D.C. Cir. 2010).  That is, this Court need not decide the "forum status" of every inch of public land covered by the Permit Regime; so long as the scheme regulates some speech in public forums, that is enough to decide the proper "standard."  *Id.* at 515-16.

3.    **Strict Scrutiny.**  The Permit Regime thus regulates speech, and does so across public forums.  The next question is the proper tier of scrutiny, which turns on whether the Regime is content-based.  *Kaahumanu*, 682 F.3d at 800.  If so, it is subject to strict scrutiny; if not, intermediate.  *Tschida v. Motl*, 924 F.3d 1297, 1303 (9th Cir. 2019).  Here, strict scrutiny is fitting, because the Regime is content-based twice over.

The "News" Exception.  The Permit Regime carves out a single favored class of speech from its reach:  The press.  Under its regulations, the Regime broadly does not apply to "news-gathering" activities—even though such filming generates an income, and otherwise satisfies the Regime's definition for "[c]ommercial filmmaking."  *See, e.g.*, 43 C.F.R. § 5.4; 43 C.F.R. § 5.12; *U.S. Forest Serv. Handbook* § 2709.11, ch. 45.52a (Sept.

18, 2008); *see also* Compl. ¶ 46.  So long as getting a permit will "interfere with the ability to gather the news," the press need not bother with the Regime.  43 C.F.R. § 5.4(a), (c).

That is a quintessential content-based regulation on speech.  A law is content-based if it "single[s] out specific subject matter for differential treatment."  *Twitter, Inc. v. Garland*, 61 F.4th 686, 697 (9th Cir. 2023).  And that is exactly what the Permit Regime does.  In order to figure out whether a permit is required for a specific film, federal bureaucrats must do two things.  One, they must examine the *content* of the *speech*, and determine whether it is "news"—as defined by the regulations, and as determined by the state.  43 C.F.R. § 5.12.  And two, they must look to the *identity* of the *speaker*, to decide whether it is a "news-media entit[y]"—again, in the eyes of the Government.  *Id.*

It is hard to get more content-based than that.  And Nathan's own experience just drives the point home.  When BLM contacted Nathan about his videos, Nathan insisted that he qualified for the news-gathering exception, because most of his videos were cataloguing and telling other peoples' stories.  Compl. ¶ 109.  But BLM disagreed: They looked at the videos, evaluated its content, and determined that it did not qualify for the exception.  *Id.*  If that is not a content-based speech regulation, then nothing is.

Last, the Permit Regime is no less content-based because its favored tier of speech is the press.  The Supreme Court has "consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers."  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 352-53 (2010).  For good reason.  It is not for the Government to decide what speech is more valuable than others.  Yet the

Regime does just that, in extinguishing the ability of those like BlueRibbon from speaking spontaneously, but protecting that privilege for those in the media. That sort of favoritism prioritizing one sort of speech and speaker over another is content-based.

"Commercial" Filming. Independently, the Permit Regime also targets income-generating speech—what it labels "commercial" filming. This too is content-based. *See, e.g.*, *S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1145 (9th Cir.) (holding that regulation limiting "commercial" handbills was impermissibly content-based, because an official "would need to examine the contents of the handbill to determine whether its distribution was prohibited"), *amended by* 160 F.3d 541 (9th Cir. 1998); *see also, e.g.*, *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 983 (10th Cir. 2020) (similar).

The reason why is intuitive: Just as above, federal officials cannot determine whether the Permit Regime applies to a given video without first reviewing the video's *contents*, and then deciding whether it was designed to appeal to a "market audience with the intent of generating income"—*i.e.*, does it fundraise, solicit donations, host an ad, etc.? Indeed, that is precisely what happened to Nathan and Kyle: The Government pulled up their videos, watched them, and assessed whether they were made to generate income. *See, e.g.*, Compl. Ex. 11 (USFS explaining to Kyle that they occasionally ask to "review footage in advance of publication" to see whether a permit is required). In other words, it targets "speech [that] results from an economic motive," and thus is a square content-based regulation. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566-67 (2011).

The Supreme Court has already struck down a similar scheme for this reason.  In *City of Cincinnati v. Discovery Network, Inc.*, the Court encountered a municipal ordinance that barred the distribution of "commercial" handbills on public property (*e.g.*, anything that had an ad, or promoted a business or event), while allowing the distribution of "non-commercial" materials, like newspapers. 507 U.S. 410, 413 & n.2 (1993).  It had no trouble concluding that the ordinance was obviously content-based, because the ban turned on "the content of the publication." *Id.* at 429.  And it had no problem striking down the ordinance as violative of the First Amendment's basic guarantees. *Id.* at 430.

<u>Balancing.</u>  Because the Permit Regime is content-based in one way or another, it is subject to strict scrutiny.  It is thus "presumptively unconstitutional," and can only survive review if it is the "least restrictive means to further a compelling interest." *Foti v. City of Menlo Park*, 146 F.3d 629, 637 (9th Cir. 1998).  When faced with a similar suit in the D.C. Circuit, the Government did not even attempt to argue the Regime could clear this towering bar. *Price v. Barr*, 514 F. Supp. 3d 171, 189 (D.D.C. 2021).[1]  Nor could it.  As discussed further below, the Regime's failure to carve out small groups and individuals all but dooms it for purposes of strict scrutiny. *See, e.g.*, *Kaahumanu*, 682 F.3d at 804 (collecting cases).  Here, case law confirms what common sense compels:  A

---

[1] In 2019, a filmmaker brought a First Amendment challenge to the NPS's part of the Permit Regime.  The D.C. District Court agreed with the plaintiff. *Price v. Barr*, 514 F. Supp. 3d 171 (D.D.C. 2021) (Kollar-Kotelly, J.).  The appeal divided the D.C. Circuit, with Judges Ginsburg and Henderson in the majority, and Judge Tatel in dissent. *Price v. Garland*, 45 F.4th 1059 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 2432 (2023).

speech scheme that subjects BlueRibbon's filming to the same requirements as it does Sony Picture's is not the least restrictive means of obtaining any governmental interest.

4.    **Intermediate Scrutiny.**  Even if the Permit Regime is deemed content-neutral, it still flunks the First Amendment.  Under intermediate scrutiny, a law must be "narrowly tailored to serve a significant government interest."  *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 940 (9th Cir. 2011) (en banc).  And it must preserve "ample alternative channels" for speech.  *Id.*  The Regime does neither.

Conservation.  The first interest that the Government has invoked to justify the Permit Regime is that it helps protect public lands and resources.  To be sure, such an interest is undoubtedly significant.  But the Permit Regime is by no means narrowly tailored to serve it, because the Regime *makes no effort at all* to tailor itself to conservation.

Rather, as touched on above, the Permit Regime is entirely agnostic as to whether filming activity actually *affects* public lands.  The Regime applies to *all* commercial filming activities, *regardless* of their impact on federal land or resources.  *See, e.g.*, 78 Fed. Reg. 52,087, 52,090 (Aug. 22, 2013) (USFS:  "There is no basis for an exclusion [from getting a permit] based on crew size or amount of equipment under this statute.").  Likewise, the Regime applies to *zero* non-commercial filming activities—even when the activities pose a *far greater* environmental impact than comparable "commercial" filming activities.

Whatever might be said of such a scheme, it is not one tailored to conservation. And it is plainly not one *narrowly* tailored to conservation.  Time and again—even when faced with speech-restricting-schemes that at least *purport* to tailor themselves to their

asserted ends—the Ninth Circuit has struck down such schemes for failing to carve out small groups and individuals. *See, e.g.*, *Cuviello v. City of Vallejo*, 944 F.3d 816, 830 (9th Cir. 2019); *see also Boardley*, 615 F.3d at 520-22 (other circuits). This because applying a permit scheme to such persons often imposes weighty burdens on their expression, while yielding fleeting benefits to the Government; and such an outsized cost to speech is almost invariably unconstitutional. *See, e.g.*, *Berger*, 569 F.3d at 1039 (collecting more).

This Permit Regime suffers from the same fatal flaws. If the goal is conservation, the Regime is woefully over- and under-inclusive: In one respect, it picks up everyone from Nathan to Netflix in the same scheme; in another, it excludes *all* non-commercial filmmakers, plus *some* commercial filmmakers (the press). This bears all of the hallmarks of a scheme untailored to its asserted interest. *Discovery Network*, 507 U.S. at 424. And the Government has never offered any way to make sense of its system, or why it must include small groups and individuals. If anything, the Government has shown *the opposite*: After a district court enjoined NPS's permitting regulations in a similar suit, the agency adopted (since repealed) interim regulations with this very carveout, and the Government has never shown they caused any harm to conservation. *See* Compl. ¶ 154.

Money. The Government's second (and only other) asserted interest is that the Permit Regime raises money. Recall, by statute, the Regime's many fees are designed not only to pay for administration costs, but *also* so that the United States can obtain a "fair return" (*i.e.*, profit) on people using its land. But this interest does not work either.

For starters, this rent-extraction interest is not legitimate.  It is settled law that the Government may not "impose a charge for the enjoyment of a right granted by the federal constitution," including those under the First Amendment.  *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943).  What's more, the Supreme Court has squarely held the Government cannot single out a specific sort of expression for the purposes of raising revenue.  *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987).  And of a piece, the lower federal courts have regularly struck down regulatory programs that tax speech in excess of whatever costs are strictly necessary to administer the scheme.  *See, e.g.*, *Kwong v. Bloomberg*, 723 F.3d 160, 165-66 (2d Cir. 2013) (collecting cases).

These principles control here.  Under the Regime, if an American with a smartphone and a monetized social media page wants to film himself giving a political speech on the National Mall or in front of the Vietnam Veterans Memorial (both managed by NPS), he needs to pay the state.  The Constitution does not permit such rent-extraction, for the ability to charge inherently comes with it the ability to silence.

Regardless, *even if* this rent-extraction interest is legitimate, the Permit Regime is not narrowly tailored to serve it.  As explained, the Regime's many fees are prohibitive for small groups and individuals like BlueRibbon; but the meager revenue that comes from forcing them to acquiesce is a rounding error in these agencies' budgets.  *See* Compl. ¶ 153.  Here too, such an outsized cost to speech exceeds what the First Amendment tolerates.  More, if the goal is raising cash, the Regime is once more over- and under-inclusive:  It makes no sense to force shoestring filming operations like

Nathan and Kyle's to pay fees while allowing multi-national corporations like CNN and Fox to get to film *gratis*. Instead, a narrowly tailored scheme would look more like what the Government (again) already did with its interim regulations, carving out "low-impact filming" from the Regime's various permit-and-fee requirements. *Id.* ¶ 154.

<u>Alternative Channels.</u> Last, the Permit Regime also fails intermediate scrutiny because it fails to keep open ample alternative channels for the speech at issue. As touched on, for groups like BlueRibbon, there is no substitute for actually filming *on* the lands themselves; doing so is integral to the message, and its efficacy. *Id.* ¶ 156. And as also explained, for groups like BlueRibbon, they cannot film on these lands without funding (and without falling within the Regime's ambit). *Id.* ¶ 64. The Regime thus "functions as 'an absolute prohibition on a particular type of expression'"—filming designed to appeal to a market audience with the intent of generating income. *Project Veritas*, 72 F.4th at 1065. And because that absolute prohibition does not allow for any ample *adequate* alternatives—*i.e.*, ways to practically film on public lands without a permit—it cannot survive intermediate scrutiny. *See, e.g.*, *Boardley*, 615 F.3d at 524-25.

**5.     Reasonableness.** To gild the lily, *even if* the Permit Regime were content-neutral, and *even if* it were deemed to apply only to non-public forums, it *still* would not survive First Amendment scrutiny, because its capacious restrictions are not reasonable.

If nothing else, restrictions on speech must at minimum be "reasonable." *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965 (9th Cir. 1999). This standard is more demanding than rational basis review; the Government must show

that a speech-restrictive scheme actually "fulfills a legitimate need." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 966-67 (9th Cir. 2002).  The telltale sign of an unreasonable regulation on speech is where the Government "fail[s] to select . . . simple available alternative[s]" that accomplish the same basic ends without markedly burdening speech in the same measure.  *Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1216 (9th Cir. 1996).

The Regime fails this basic command.  As noted, the Government *has implemented* a "simple available alternative" that furthers its interests while preserving speech:  NPS' interim regulations, which carved out all "low-impact" filming, regardless of its nature.  Unlike the current Permit Regime, that scheme treated like activities alike, and targeted the actual activities—larger film operations—that really implicated its asserted interests.  By contrast, the current Regime lacks a "sensible basis for distinguishing" *some* commercial filming (like BlueRibbon's) from *other* commercial filming (like CNN's), as well as differentiating commercial filming from *all* non-commercial filming, irrespective of its effect on public land.  *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018).

### C.   The Appropriate Remedy is Facial Relief.

The Permit Regime is unconstitutional:  One way or another, it burdens speech in a way that cannot survive First Amendment scrutiny.  And in light of its infirmities, the proper remedy is to hold the Regime facially unlawful, and enjoin its enforcement.

Facial relief—invalidating an entire scheme, in all applications—is the traditional remedy for laws that specifically "regulat[e] expression." *Spirit of Aloha Temple v. Cnty. of Maui*, 49 F.4th 1180, 1189-90 (9th Cir. 2022) (collecting cases involving permits).  This

because "an as-applied challenge [to a prior restraint] may fail to provide sufficient protection against content-based censorship," since "potential speakers may choose to self-censor rather than either acquire a license or risk sanction." *Epona, LLC v. Cnty. of Ventura*, 876 F.3d 1214, 1221 (9th Cir. 2017). As such, so long as "a substantial number of [a law's] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep," the scheme falls *in toto*. *Knox v. Brnovich*, 907 F.3d 1167, 1180 (9th Cir. 2018).

The Permit Regime should meet this fate. It exclusively targets expression. And as explained, a bulk of its applications are unconstitutional—far beyond BlueRibbon. The Regime is practically silencing for all small groups and individuals, and further extinguishes a tremendous store of spontaneous speech for all sorts of speakers. This problem is only made worse by the unbound discretion that the Regime's enforcers possess. Because of the Regime's capacious scope—reaching any person who posts any video that may someday earn some income—it is impossible for the Government to prosecute all transgressors; the result, though, is a scheme where the Government can pick-and-choose the sort of *speech* it wants to target, and the sort of *speakers* it wants root out. Such an "unbridled" scheme merits facial relief. *Kaahumanu*, 682 F.3d at 807.

To the extent that the Government wants to try its hand at a new permit scheme that is narrowly tailored to its actual interests and original focus, it should fall to the Executive Branch to do so in the first instance. This Court lacks the means, or authority, to "blue-pencil" the Permit Regime to design one that complies with the First Amendment. *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 509 (2010). But at the least,

this Court should nonetheless hold that the Regime is unconstitutional as applied to BlueRibbon and its members, with respect to all of their low-impact filming activities.

## II.   THE EQUITABLE FACTORS FAVOR BLUERIBBON.

"[W]hen a party has established likelihood of success on the merits of a constitutional claim—particularly one involving a fundamental right—the remaining *Winter* factors favor enjoining the likely unconstitutional law." *Junior Sports Magazines*, 80 F.4th at 1120.  That rule makes good sense, and applies here in full force.  Absent relief, BlueRibbon and its members will suffer irreparable harm from the "loss of First Amendment freedoms." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976).  Likewise, neither the public interest nor the equities, taken together, weigh against relief.  There is a controlling public interest in "upholding free speech principles." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).  Likewise, the Government will not be adversely affected by complying with the Constitution.  Once more, the Government has ready means at its disposal to accommodate any injunction—namely, the interim regulations it adopted after the *last* preliminary injunction.  All told, the Permit Regime is unconstitutional, and every equitable factor supports this Court putting a stop to it.

## CONCLUSION

This Court should enjoin the Defendants from enforcing the Permit Regime.[2]

---

[2] Given the relative interests at stake, this Court should additionally waive bond. *See, e.g.*, *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 548 (N.D. Cal. 2020).

Dated:  November 15, 2023                    Respectfully submitted,


                                             *s/ David P. Claiborne*

                                             David P. Claiborne (ISBN: 6579)
                                             SAWTOOTH LAW OFFICES, PLLC
                                             Golden Eagle Building
                                             1101 W. River Street, Suite 110
                                             Boise, Idaho 83702
                                             Telephone:  (208) 629-7447
                                             Facsimile:  (208) 629-7559
                                             david@sawtoothlaw.com

                                             Yaakov M. Roth*
                                             Harry S. Graver*
                                             JONES DAY
                                             51 Louisiana Avenue, N.W.
                                             Washington, D.C. 20001
                                             Telephone:  (202) 879-3939
                                             yroth@jonesday.com
                                             hgraver@jonesday.com

                                             Samuel V. Lioi*
                                             Matthew R. Modderman*
                                             JONES DAY
                                             901 Lakeside Avenue
                                             Cleveland, Ohio 44114-1190
                                             Telephone:  (216) 586-7135
                                             slioi@jonesday.com
                                             mmodderman@jonesday.com

                                             **Pro Hac Vice* Forthcoming

                                             *Counsel for Plaintiff*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff respectfully requests oral argument on this motion.  This case raises important questions about the First Amendment, and the constitutionality of a federal program.  Oral argument would materially assist the Court in resolving this matter.

Dated:  November 15, 2023                    Respectfully submitted,


*s/ David P. Claiborne*

*Counsel for Plaintiff*

## CERTIFICATE OF COMPLIANCE

This motion complies with Federal Rule of Civil Procedure 7 and Local Rule of Civil Procedure 7.1, because it does not exceed twenty pages in length, and otherwise satisfies the other requirements laid out in this Court's rules of motion practice.


Dated:  November 15, 2023          Respectfully submitted,


                                   *s/ David P. Claiborne*

                                   *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

On November 15, 2023, I filed the foregoing using ECF and, consistent with

FRCP 4(i), caused the same to be served to the following by registered or certified mail:

MERRICK GARLAND
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

CHARLES F. SAMS III
Director
National Park Service
1849 C Street NW
Washington, DC 20240

DEBRA A. HAALAND
Secretary
U.S. Department of the Interior
1849 C Street, N.W.
Washington DC 20240

RANDY MOORE
Chief
U.S. Forest Service
1400 Independence Ave., SW,
Washington, D.C. 20250

THOMAS J. VILSACK
Secretary
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250

JOSHUA D. HURWIT
U.S. Attorney, District of Idaho
1290 W. Myrtle St.
Suite 500
Boise, ID 83702

TRACY STONE-MANNING
Director
Bureau of Land Management
1849 C Street NW
Washington, DC 20240

Dated:  November 15, 2023          Respectfully submitted,


*s/ David P. Claiborne*

*Counsel for Plaintiff*