JOSHUA D. HURWIT, IDAHO STATE BAR
NO. 9527
UNITED STATES ATTORNEY
CHRISTINE G. ENGLAND, IDAHO STATE
BAR NO. 11390
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
1290 W. MYRTLE ST. SUITE 500
BOISE, ID 83702-7788
TELEPHONE: (208) 334-1211
Email: Christine.England@usdoj.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
LESLEY FARBY
Assistant Director
Federal Programs Branch

JOSEPH E. BORSON (Va. Bar No. 85519)
Senior Trial Counsel
CODY T. KNAPP (NY Bar No. 5715438)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 532-5663
Fax: (202) 616-8470
Email: cody.t.knapp@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BLUERIBBON COALITION,<br><br>     Plaintiff,<br><br>v.<br><br>MERRICK GARLAND, *et al*,<br><br>     Defendants, | Case No. 4:23-cv-00505-DCN<br><br>**DEFENDANTS' BRIEF IN OPPOSITION TO PLAINITFF'S MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

BACKGROUND .......................................................................................................2

   I.  Statutory and Regulatory Background...........................................................2

   II.  The Price v. Garland Litigation....................................................................4

LEGAL STANDARDS............................................................................................4

ARGUMENT............................................................................................................5

   I.  BlueRibbon Is Not Likely To Succeed on the Merits of Its Claim. ..................5

     A.  BlueRibbon's facial challenge is improper. ...............................................5

     B.  The commercial-filming regulations comport with the First Amendment. ..................7

       1.  The commercial-filming regulations are content-neutral.......................7

       2.  The commercial-filming regulations are reasonable time, place, and manner restrictions.......................................................................13

   II.  The Equitable Factors Weigh Against Injunctive Relief. ................................18

   III.  Plaintiff's Requested Relief Is Overbroad ...................................................20

CONCLUSION.......................................................................................................20

**INTRODUCTION**

Together, the National Park Service (NPS), the Bureau of Land Management (BLM), and the United States Forest Service (USFS) administer some of the country's most beautiful, most fragile, and most visited lands.  The agencies do so under instructions from Congress to conserve those lands for the enjoyment of future generations, *see, e.g.*, 54 U.S.C.A. § 100101, and with direction to seek to "receive fair market value of the use of the public lands and their resources," 43 U.S.C. § 1701(a)(9); *see also* 31 U.S.C. § 9701.  Consistent with these congressional directives, the agencies generally require permits and payment of land use fees for any private, commercial uses of the federal lands they manage.  And for more than 20 years, the law has imposed such permit- and land-use-fee-requirements on nearly all commercial filming activities performed on federal lands.

The agencies' commercial-filming regulations serve important interests.  The regulations help to avoid or minimize impacts to resources and the enjoyment of other visitors from commercial filming.  They ensure that the public obtains a fair return for filming that occurs on federal lands for private commercial gain—just as the public earns a fair return when a concessionaire sells food (or souvenirs) on federal land, and just as any other landowners can charge for filming on their own land.  And as the D.C. Circuit recently concluded, the commercial-filming regulations advance these important interests in a manner consistent with the First Amendment.  *See Price v. Garland*, 45 F.4th 1059 (D.C. Cir. 2022), *cert. denied* 143 S. Ct. 2432 (2023).

Now, in a transparent effort to sidestep the D.C. Circuit's recent precedent, the BlueRibbon Coalition asks this Court to upend the well-established regulations governing all commercial filming on federal lands—including expansive Hollywood film crews wielding large amounts of equipment and props—by entering a preliminary injunction against the regulations wholesale, with nationwide effect.  According to BlueRibbon, the commercial-filming regulations erect a "breathtaking" and

"suppressive" regime that silences small-scale and individual filmmakers who wish to monetize films they create on federal land without paying a reasonable fee for the private commercial use of public resources. But aside from such rhetorical flourishes, BlueRibbon makes little attempt to satisfy the standards that govern facial challenges like the one it advances here. Even if it had made a colorable attempt to satisfy those standards, BlueRibbon would still be unlikely to succeed on the merits of its First Amendment claim because the commercial-filming regulations are content-neutral, viewpoint-neutral, and reasonable time, place, and manner restrictions. Finally, the absence of any extraordinary circumstances or threat of irreparable harm, coupled with the mismatch between BlueRibbon's requested relief and the harms it seeks to redress, tilt the balance of equitable factors heavily against injunctive relief. The Court should deny BlueRibbon's motion for a preliminary injunction.

## BACKGROUND

### I.     Statutory and Regulatory Background

By statute, whenever someone seeks to use public resources for private commercial gain, the federal government generally requires that person to obtain a land use authorization and pay a land-use fee. Congress has provided, for example, that "each service or thing of value provided by an agency . . . to a person . . . is to be self-sustaining to the extent possible." 31 U.S.C. § 9701(a). Agencies may thus "charge for a service or thing of value provided by the agency" based, in part, on "the value of the service or thing to the recipient." *Id.* § 9701(b). The NPS, BLM, and USFS are governed by a materially identical statutory and regulatory commercial filming system; to avoid unnecessary cross-references, this brief will use citations primarily to the NPS regime. *See* Compl. ¶ 37.

The D.C. Circuit recently summarized the NPS's regulations governing the commercial use of National Park System lands, including commercial filming. *See Price*, 45 F.4th at 1064–65.

> By statute, the Secretary of the Interior must "require a permit and . . . establish a reasonable fee for commercial filming activities" on land administered by the NPS. 54

U.S.C. § 100905(a)(1). In keeping with this mandate, the implementing regulations state that "[a]ll commercial filming requires a permit," and that the NPS "will require a reasonable location fee . . . assess[ed] . . . in accordance with a fee schedule . . . publish[ed] in the Federal Register." 43 C.F.R. §§ 5.2(a), 5.8(a)(1), (3). The regulations go on to define "commercial filming" as "the film, electronic, magnetic, digital, or other recording of a moving image by a person, business, or other entity for a market audience with the intent of generating income." *Id.* § 5.12. Although some news gathering activities fit within this definition, the regulations generally exempt news gathering from these requirements. *Id.* § 5.4.

The regulations also specify that a permit will be denied if, among other reasons, it is likely an activity would: "(a) Cause resource damage; (b) [u]nreasonably disrupt or conflict with the public's use and enjoyment of the site; (c) [p]ose health or safety risks to the public; [or] (d) [r]esult in unacceptable impacts or impairment to National Park Service resources or values." 43 C.F.R. § 5.5.

The location fee, which must be calculated to "provide a fair return to the United States," is to be based upon "the number of days of the filming activity," "the size of the crew," "the amount and type of equipment present," and any "other factors . . . the Secretary considers necessary." 54 U.S.C. § 100905(a)(1)-(2). In addition to the location fee, the Secretary must recover "any costs incurred as a result of filming activities." *Id.* 100905(b). A person convicted of engaging in commercial filming without obtaining a permit or paying a fee faces a fine and up to six months in prison. *See* 18 U.S.C. § 1865; 36 C.F.R. § 1.3, 5.5(a).

These regulations are consistent with others that apply to various types of commercial activity conducted on land administered by the NPS. For instance, it is generally prohibited to "engag[e] in or solicit[ ] any business in park areas, except in accordance with the provisions of a permit, contract, or other written agreement with the United States." 36 C.F.R. § 5.3. Similarly, a concessionaire must contract with the Government and pay a "franchise fee." 54 U.S.C. § 101913. Finally, a person who wishes to provide services to visitors on NPS land must obtain authorization and pay "a reasonable fee for issuance of a commercial use authorization." 54 U.S.C. § 101925(a)(2)(A).

All these regulations are consistent with and implement the Congress's declaration "that it is the policy of the United States that the United States receive fair market value of the use of the public lands and their resources." 43 U.S.C. § 1701(a)(9). They are also consistent with the Congress's delegation of authority to "[t]he head of each agency" to "prescribe regulations establishing the charge for a service or thing of value provided by the agency," 31 U.S.C. § 9701(b), because "[i]t is the sense of Congress that each service or thing of value provided by an agency . . . to a person . . . is to be self-sustaining to the extent possible," *id.* § 9701(a).

## II.     The *Price v. Garland* Litigation

In 2019, a plaintiff brought a suit against NPS's commercial-filming regulations, arguing that "the permit-and-fee requirements are facially unconstitutional under the First Amendment to the Constitution of the United States." *Price*, 45 F.4th at 1064. The D.C. Circuit rejected this challenge. It concluded that commercial filming was subject to the reasonableness standard, *i.e.*, that "[t]he 'restriction must not discriminate against speech on the basis of viewpoint, and the restriction must be reasonable in light of the purpose served by the forum.'" *Id.* at 1072 (citation omitted). The Court held that the regulations met this standard. With respect to the land-use fee requirement, the Court "ha[d] no difficulty rejecting [plaintiff's] contention that the location fee violates" the Constitution, since "[t]he fee requirement merely puts a commercial filmmaker on the same footing as any other person who uses park land for a commercial purpose, such as a concessionaire." *Id.* at 1073. And with respect to the permitting requirement, the Court similarly concluded that "[p]rotecting and properly managing park lands are undoubtedly significant government interests." *Id.* The D.C. Circuit also rejected an argument that the "special treatment the NPS regulations afford to 'news-gathering activities' amounts to an impermissible content-based distinction." *Id.* at 1075. The Court concluded these "arguments are without merit," and "[t]he favorable treatment of news-gathering is but an example of the unremarkable practice of the Congress 'sometimes granting the press special privileges and immunities.'" *Id.* (quoting *Associated Press v. FCC*, 452 F.2d 1290, 1298 (D.C. Cir. 1971)).

## LEGAL STANDARDS

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citation omitted). A "possibility" of irreparable harm is insufficient; irreparable harm must be *likely* absent an injunction. *Id.*; *see also Winter v. NRDC*, 555 U.S. 7, 22 (2008). It is a plaintiff's burden to establish each factor. *See DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

**ARGUMENT**

I.      **BlueRibbon Is Not Likely To Succeed on the Merits of Its Claim.**

        A.      **BlueRibbon's facial challenge is improper.**

BlueRibbon's suit is a facial challenge to regulations applicable to *all* commercial filming activities on *all* NPS, BLM, and USFS-managed lands. *See* Pl.'s Br. at 18. The incorrect premise of its argument is that if there is at least one inch of federal lands that constitutes a public forum, then the *entire* regulatory regime must be reviewed under the public forum standard, and that if the regulations are inapplicable with respect to that one inch of land, then the entire regime must fall. *Compare id.* at 10 (citing *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 515 (D.C. Cir. 2010)). )) *with Boardley*, 615 F.3d at 515–516 (holding that the NPS's filming regulations should only be analyzed as applying to public forums in "free speech areas," and not "the diverse range of other areas within the national parks"). And BlueRibbon argues that if the regulations cannot pass muster under *even one* factual circumstance, the entirety of the regulations must fall. *See, e.g.*, Pl.'s Br. at 14–15. This bootstrapping argument cannot be squared with governing precedent.

As recently as last Term, the Supreme Court reaffirmed the strict limits on facial challenges. "[L]itigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid." *United States v. Hansen*, 599 U.S. 762, 769 (2023) (citation omitted). There is a limited exception to that rule in the First Amendment

context, but even there, the plaintiff must "demonstrate that the statute prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *Id.* at 770 (quotation omitted). "Because it destroys some good along with the bad, invalidation for overbreadth is strong medicine that is not to be casually employed. . . . To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be *substantially disproportionate* to the statute's lawful sweep." *Id.* (quoting *Williams*, 553 U.S. at 293) (emphasis added). "In the absence of a lopsided ratio, courts must handle unconstitutional applications as they usually do—case-by-case." *Id.*

In other words, BlueRibbon's argument—that if any land managed by the agencies is a public forum, and if the regulations do not pass muster under the public forum standards, then the entire set of regulations fails—is patently deficient. To carry its burden in this case, BlueRibbon must show a "lopsided ratio" of unconstitutional applications, yet it makes essentially no attempt to do so. Not all federal lands—arguably, not even most federal lands—are a public forum. As the D.C. Circuit held, "we have recognized that our country's many national parks are too vast and variegated to be painted with a single brush for purposes of forum analysis." *Oberwetter v. Hilliard*, 639 F.3d 545, 552 (D.C. Cir. 2011). Rather, "many national parks include areas—even large areas, such as a vast wilderness preserve—which never have been dedicated to free expression and public assembly, would be clearly incompatible with such use, and would therefore be classified as nonpublic forums." *Id.* (citation omitted); *see also* 16 U.S.C. 1133(c) (prohibiting commercial enterprise in wilderness); Decl. of Margaret Elizabeth Tyler, Ex. 1, ¶ 7 (noting that "over eighty percent of all NPS lands are managed as wilderness"); Decl. of Lilly Suzanne Greenhalgh, Ex. 1, ¶¶ 5–7. Blueribbon never claims to be filming in a public forum, much less that the entirety of public land managed by the agencies whose regulations it challenges is a public forum. Moreover, BlueRibbon seeks to invalidate the entire regime based on arguments about the lowest impact possibility, without attempting to show that scenario's

relative size or impact. And because BlueRibbon makes no attempt to make the showing the *Hansen* Court requires, this Court should deny BlueRibbon's request for facial invalidation of the entire regulatory regime on the basis that applies, non-exclusively, to public forums.

**B.      The commercial-filming regulations comport with the First Amendment.**

Even if it had made out an otherwise proper facial challenge, BlueRibbon would still be unlikely to succeed on the merits of its claim. As the D.C. Circuit held in *Price*, the statute and regulations imposing permit and fee requirements for commercial filming on public lands create content-neutral time, place, and manner restrictions that may be applied consistent with the First Amendment on all federal lands—especially the vast swaths that lay far outside any public forum and are of principal concern to BlueRibbon and its members.

**1.      The commercial-filming regulations are content-neutral.**

**a.** A central obstacle to BlueRibbon's success on the merits is the fact that the commercial-filming regulations do not discriminate against any expressive activity based on content. "A regulation of speech is facially content based under the First Amendment if it 'targets speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). But here, the challenged regulations apply only to "[c]ommercial filming activities," defined as filming "with the intent of generating income" from "a market audience." 43 C.F.R. § 5.12. On the face of those provisions, "the content of the material does not play a role" in determining whether a filming activity qualifies as "commercial." Commercial Filming and Similar Projects and Still Photography Activities, 78 Fed. Reg. 52,087, 52,090 (Aug. 22, 2013). To determine if a permit or fee is required, the relevant question is whether a filmmaker intends to raise revenue from filming, not what the camera captures.

Put differently, the commercial-filming regulations are "agnostic as to content." *City of Austin*, 596 U.S. at 69. Thus, under the commercial filming regulations at issue in this litigation, a person may film on public land, about any subject-matter, and while expressing any viewpoint or message, without triggering these permit or fee requirements. In doing so, the person can intend either to generate no income or to use the resulting footage to generate income from a market audience. Only the intent to use footage to generate income triggers application of the commercial-filming regulations. Because that distinction is not based on the "communicative content" of any footage, *id.*, the commercial-filming regulations are facially content-neutral.

The Ninth Circuit recognized just this point in *Kaahumanu v. Hawaii*, 682 F.3d 789 (9th Cir. 2012). That case concerned Hawaii state regulations that required a "written permit" to "engage in commercial activities of any kind" on public beaches. *Id.* at 794. Pursuant to those regulations, the state required permits and the payment of fees for any "commercial weddings" to be performed on public beaches—even "[w]eddings with as few as three people (the wedding couple and a paid officiant) require[d] a permit." *Id.* at 795. Faced with a First Amendment challenge to this requirement, the Ninth Circuit concluded that the permitting requirement was content-neutral as applied to commercial weddings, notwithstanding the inherently expressive nature of the weddings. *Id.* at 805. Critically there, as here, the "triggering factor for requiring a permit" was "that a wedding be 'commercial'"—that is, "involve the 'use of or activity on state land for which compensation is received . . . for goods or services.'" *Id.* As in *Kaahumanu*, because the applicability of the commercial-filming regulations does not turn on the expressive content of a video, those regulations must be evaluated using the less-stringent standards that apply to content-neutral speech regulations.

**b.** BlueRibbon ignores *Kaahumanu*'s holding, contending that the commercial-filming regulations are "square content-based regulation" because they "target[] income-generating speech."

Pl.'s Br. at 12. That contention is unsound. While otherwise "'facially content neutral' regulations" can be content-based if they "'cannot be justified without reference to the content of the regulated speech' or 'were adopted by the government because of disagreement with the message the speech conveys,'" *Porter v. Martinez*, 68 F.4th 429, 439 (9th Cir. 2023) (quoting *Reed*, 576 U.S. at 164), nothing warrants such a conclusion with respect to the commercial-filming regulations.

For one thing, the challenged regulations do not "target" commercial filming in any manner that suggests they were adopted because of any disagreement with a commercial filming message. Instead, the commercial-filming regulations comprise just one piece of a comprehensive statutory and regulatory framework governing private commercial activity on federal lands in general. *See Price*, 45 F.4th at 1073 ("The Government has not singled out speech to charge a fee; as detailed above, it charges a fee for all types of commercial activity on land" it controls.). Pursuant to that framework, commercial activities generally are prohibited on public lands unless the commercial actor obtains prior authorization and pays a reasonable land-use fee. *See, e.g.*, 36 C.F.R. § 5.3 ("Engaging in or soliciting any business in park areas, except in accordance with the provisions of a permit, contract, or other written agreement with the United States, except as such may be specifically authorized under special regulations applicable to a park area, is prohibited."); 43 C.F.R. § 2920.0-6(a) (stating that "land use authorizations shall be issued only at fair market value"). Similarly, a "special park use" permit and fee payment are required to use park land to "provide[] a benefit to an individual, group, or organization rather than the public at large." National Park Service Management Policies § 8.6.1, https://www.nps.gov/subjects/policy/upload/MP_2006.pdf. Rights-of-way for utilities over NPS land generally require payment of fair market value for the use of the land. *See id.* § 8.6.4.1. And uses of BLM-managed public lands that do not qualify as casual use under 43 C.F.R. § 2920.0-5(k) generally require an authorization from the BLM that "shall be issued only at fair market

value." 43 C.F.R. § 2920.0-6(a). Given this broader regulatory context, there is no credible suggestion that the commercial-filming statute or regulations were "motivated by disagreement with any particular expressive use" of commercial films. *Porter*, 68 F.4th at 443; *see also Price*, 45 F.4th at 1073 ("The [location] fee . . . is reasonable extraction of a rent by the owner of a property.").

Nor is it the case that the commercial-filming regulations "cannot be justified without reference to the content of the regulated speech." *Id.* at 439 (quoting *Reed*, 576 U.S. at 164). BlueRibbon argues that "federal officials cannot determine whether the [commercial-filming regulations] appl[y] to a given video without first reviewing the video's *contents*, and then deciding whether it was designed to appeal to a 'market audience with the intent of generating income,'" Pl.'s Br. at 12, but that is false. Rather, as NPS explained when promulgating its current regulations, "the content of the material does not play a role in the decision to approve or deny a permit request." 78 Fed. Reg. at 52,090. Film used to make money is not a genre and has no particular content. The government generally does not need to review footage at all to determine which rules apply. And, to the extent the government might sometimes view footage—in order, for example, to determine whether it was shot on public land—it does so in a strictly content-neutral manner "in service of drawing neutral, location-based lines." *City of Austin*, 596 U.S. at 69; *see also id.* at 72 (reaffirming that the Supreme Court's "First Amendment precedents and doctrines have consistently recognized that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral").[1] Similarly, it makes no difference that, in other circumstances, an officer might review the content of a video to determine whether it was

---

[1] Thus, BlueRibbon's concern that the USFS may "occasionally ask to 'review footage in advance of publication' to see whether a permit is required," Pl.'s Br. at 12, is misplaced. As the context surrounding that cherry-picked quote indicates, the USFS uses such reviews to determine whether the commercial filming regulations are properly applied. *See, e.g.*, Pl.'s Compl. Ex. 11, at 1 (explaining USFS may sometimes "review the footage and check the GPS coordinates of the photos/footage" in order "to verify" whether footage was captured on National Forest System lands).

meant to generate income. *See, e.g.*, Pl.'s Compl. Ex. 11, ECF No. 1-11, at 4 (informing filmer that past filming activity "falls under commercial business" after observing, among other things, that film "directs and thanks folks for using Patreon" and was "connected to Pay-to-view, [a] gear website or directly related to getting parts cheaper"). The First Amendment allows the use of speech as evidence of motive or intent. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). And such reviews are consistent with the Supreme Court's conclusion that regulations of solicitation—i.e., "speech 'requesting or seeking to obtain something' or '[a]n attempt or effort to gain business'"—are not necessarily content-based, even though "one must read or hear" speech to determine if it entails solicitation. *City of Austin*, 596 U.S. at 72 (quoting Black's Law Dictionary 1677 (11th ed. 2019)).

BlueRibbon attempts to analogize this case to *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993), but *Discovery Network* is inapposite. There, the Supreme Court concluded that a city could not nominally ban the distribution of all printed materials from racks on city-owned land based on a purported interest in aesthetics, while exempting newspaper racks, because the exemption swallowed the rule: just 62 racks distributing advertising booklets were actually subject to the ban on rack-based distribution while nearly 2,000 newspaper racks were exempt, even though the city's aesthetics-based rationale for the ban applied equally to racks distributing advertisements and newspapers. *Id.* at 417–18. The lines drawn by the ordinance thus bore "no relationship *whatsoever* to the particular interests that the city ha[d] asserted." *Id.* at 424. By its own terms, that "narrow" holding does not preclude differential treatment of commercially motivated content where, as here, that differential treatment is "relevant to an interest" asserted by the government, *id.* at 428, such as receiving a fair return for the private use of public resources and protecting public lands. Moreover, the rack ordinance in *Discovery Network* targeted advertisements based on the city's estimation of the "low value" of their content. *Id.* at 429. And the city distinguished between advertisement booklets

and other publications by examining the "ratio of advertising to other text." *Id*. at 419. The commercial-filming regulations, by contrast, do not proceed from any assessment of the value of any type of content. Nor do they target advertising. Instead, they look solely to income generation. A film that advocates the purchase of some good, for which the filmer obtains no income, is not covered, while a documentary that proposes no commercial transactions at all *is* covered if the filmer generates income from a market audience.

**c.** BlueRibbon also errs in contending that the commercial-filming regulations must be assessed as content-based because they provide certain exemptions from permit and fee requirements for "news-gathering activity" and so "carve[] out a single favored class of speech." Pl.'s Br. at 10. The regulations define "[n]ews-gathering activities" as filming by a "representative of the news media" who "gathers information of potential interest to a segment of the public, uses . . . editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 43 C.F.R. § 5.12. Thus, the exemptions apply (or not) based on the type of work being done—e.g., using editorial skills to produce journalism—not the content of that reporting. They do not turn on whether the news media covers a particular news event, or whether that coverage involves a particular subject-matter, message, or viewpoint. Accordingly, the news-gathering exemptions are facially content-neutral.

Moreover, the news-gathering exemptions reflect a traditional and well-established recognition of the important function the news media serves in our democratic society. In keeping with that tradition, the Supreme Court has found that a state may "privilege the press" when designing a right of publicity, *Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 578–79 (1977), that "Congress has freedom to determine whether a statutory newsman's privilege is necessary and desirable," *Branzburg v. Hayes*, 408 U.S. 665, 706 (1972), and that a state may apply "a lower rate" of sales tax "to the press," *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 590 n.13

(1983) (emphasis omitted), or exempt newspapers from sales tax, *Leathers v. Medlock*, 499 U.S. 439, 453 (1991). Courts themselves have crafted exemptions for the media from otherwise applicable court rules. *See, e.g.*, 2d Cir., *Local Rules and Internal Operating Procedures*, App'x Part B (2019), https://go.usa.gov/xFvPW. Congress too has often exempted news media from regulatory restrictions on expressive activities. *See, e.g.*, 49 U.S.C. § 13506(a)(7) (requiring motor carriers to register with the Secretary of Transportation to haul freight but excepting carriers "used only to distribute newspapers"). And the Freedom of Information Act provides that representatives of the news media pay lower processing fees than others. *See* 5 U.S.C. § 552(a)(4)(A)(i). Notably, no court has questioned the constitutionality of that provision, which served as the model for the commercial-filming regulations' news-gathering exemptions. *See* 78 Fed. Reg. at 52,092. Because the news-gathering exemptions are not "directed at," and do not "present[] the danger of suppressing, particular ideas," *Leathers*, 499 U.S. at 453, there is no cause to subject the commercial-filming regulations to the heightened First Amendment scrutiny reserved for content-based regulations.[2]

## 2. The commercial-filming regulations are reasonable time, place, and manner restrictions.

Because the commercial-filming regulations are content neutral, strict scrutiny does not apply. *Contra* Pl.'s Br. at 10–14. Instead, BlueRibbon's challenge should be analyzed using the lower-level scrutiny applicable to time, place, and manner restrictions. Under those standards, BlueRibbon is not likely to succeed on the merits of its First Amendment claim.

---

[2] Even if the Court thought the news-gathering exceptions to be invalid, that conclusion would not provide a basis for enjoining the commercial-filming regulations in toto. Rather, equitable considerations would weigh against excusing *all* commercial filmers—including large Hollywood film crews—from the permit-and-fee requirements because the government treated reporters working on matters of public interest too favorably. *Cf. Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2355 (2020) (remedying First Amendment violation by invalidating a narrow exception where doing so left the broader regulatory regime largely intact).

**a.**  The strength of a private speaker's right to access government property for expressive activity generally depends on whether the government has created a forum for expression, and if so, what type of forum.  That right is most robust in "[t]raditional public forums" that "are 'devoted to assembly and debate' because of a 'long tradition or . . . government fiat,'" *Kaahumanu*, 682 F.3d at 799 (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998)), and in designated public forums that the government has "intentionally open[ed] . . . for public discourse," *id.* at 800 (quoting *Ark. Educ. Television Comm'n*, 523 U.S. at 677).  "In both traditional and designated public fora, . . . content-based restrictions must be viewpoint neutral and satisfy strict scrutiny review." *Camenzind v. Cal. Exposition & State Fair*, 84 F.4th 1102, 1109 (9th Cir. 2023) (quoting *Koala v. Khosla*, 931 F.3d 887, 900 (9th Cir. 2019)).  And while "the government may impose reasonable time, place, and manner restrictions on speech" in traditional and designated public forums,  *id.*, such restrictions "must (1) be content neutral, (2) survive intermediate scrutiny review, and (3) 'leave open ample alternative channels for communication of the information,'" *Project Veritas v. Schmidt*, 72 F.4th 1043, 1064 (9th Cir. 2023) (quoting *Hoye v. City of Oakland*, 653 F.3d 835, 844 (9th Cir. 2011)).

"In a nonpublic forum, on the other hand—a space that 'is not by tradition or designation a forum for public communication'—the government has much more flexibility to craft rules limiting speech." *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)).  "After all, 'nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property.'"  *Camenzind*, 84 F.4th at 1109 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985)).  In a nonpublic forum, regulations of expressive activity need only be "(1) reasonable in light of the purpose served by the forum and (2) viewpoint neutral." *Kaahumanu*, 682 F.3d at 800 (quotation omitted).

**b.** For the reasons given by the D.C. Circuit in *Price*, forum principles are not appropriate for evaluating a challenge like BlueRibbon's. *See, e.g.*, 45 F.4th at 1067–71. BlueRibbon simply does not seek to use public lands as a "forum" within the meaning of the Supreme Court's First Amendment precedents. *See, e.g.*, *Perry*, 460 U.S. at 45 (describing limits of government speech regulations in places "devoted to assembly and debate"). BlueRibbon has not alleged that its members seek to access public lands to communicate with other members of the public in those locations—indeed, they appear to expressly eschew the designated public forums established on public lands under Defendants' management as "undesirable." *See, e.g.*, Pl.'s Ex. 5, ECF No. 1-5, ¶ 27. Instead of seeking a venue for communication, BlueRibbon and its members seek to exploit public lands as the raw material for various expressive products they wish to exhibit on online commercial fora such as Instagram, YouTube, and Facebook. *See, e.g.*, Pl.'s Ex. 5, ECF No. 1-5, ¶ 11. While filming is no doubt expressive conduct entitled to First Amendment protection, *see Project Veritas*, 72 F.4th at 1055, the special rules providing particularly heightened protection for those who use public land as public fora accordingly do not apply in assessing BlueRibbon's claims. *See Price*, 45 F.4th at 1068 (noting "not every activity the First Amendment protects as speech benefits from the strict, speech-protective rules of a public forum"); *cf. Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 835 (1st Cir. 2020) (questioning applicability of forum analysis to the "collection of information on public property").

The permit and fee requirements at issue clearly survive the reasonableness and viewpoint-neutrality review that governs restrictions on speech on government property where a forum analysis does not apply. Nowhere does BlueRibbon contend that the regulations are not viewpoint neutral. And although BlueRibbon asserts that reasonableness demands the government re-adopt the interim regulations NPS briefly utilized during the pendency of the *Price* litigation, BlueRibbon's approach vitiates the "flexibility" the government is entitled to. *Camenzind*, 84 F.4th at 1109.

**c.** Even if forum analysis were appropriate for assessing BlueRibbon's claim, BlueRibbon would still be unlikely to succeed on the merits. Principally that is because, as explained above, BlueRibbon's facial overbreadth challenge does not account for the millions of acres of public lands that lie far outside any public forum. For the reasons discussed *supra*, the commercial-filming regulations can be applied in all those lands (and they can be applied constitutionally on all lands). So even if the regulations might fail constitutional scrutiny in some applications within the limited band of public lands that serve as public forums—and to be clear, they do not—BlueRibbon cannot show a substantial number of the regulations' applications are constitutionally impermissible. Yet even assessing the commercial-filming regulations under the test applicable to speech in public forums, the permit and fee requirements are "narrowly tailored to serve a significant governmental interest" and "leave open ample alternatives for communication." *Id.* at 1114 (quoting *Galvin v. Hay*, 374 F.3d 739, 752 (9th Cir. 2004)). Thus, BlueRibbon's claim remains unlikely to succeed.

First, the commercial-filming regulations advance two interests that are significant by any measure: (1) ensuring that filming activities do not harm federal resources or interfere with visitors to federal lands, *see* 54 U.S.C. § 100905(d); 16 U.S.C. § 460l-6d(d) (reasons for denying a permit); and (2) raising money to maintain and improve the parks for everyone's benefit, *see* 54 U.S.C. § 100905(a), (e); 16 U.S.C. § 460l-6d(a), (e) (fee "provide[s] a fair return to the United States" and may be spent by NPS for park purposes. BlueRibbon acknowledges the significance of the government's conservation interest, yet contends that the government's interest in revenue "is not legitimate." Pl.'s Br. at 16. But when the government charges reasonable fees for commercial filming on its land, it does so in a commercial and proprietary capacity as a landowner, not a regulatory capacity. *See Price*, 45 F.4th at 1073. And "when the [government] acts as a proprietor, reasonable regulations may include profit-conscious fees for access for expressive conduct, in a manner similar to fees that

would [be] charged if the forum was owned by a private party." *Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1309 (11th Cir. 2003); *see also* OMB Circular A-25 (authorizing land use fees based on fair market value when federal government acts in proprietary capacity). There is no constitutional right for a business to save money by operating on federal land.[3]

The commercial-filming regulations also satisfy the narrow-tailoring requirement for time, place, and manner restrictions in a public forum. "There is obviously no less restrictive means for [the government] to raise revenue than to charge for the use of its facilities or services." *Gannett Satellite Info. Network, Inc. v. Metro. Transp. Auth.*, 745 F.2d 767, 775 (2d Cir. 1984). And while revenue-raising fees that reflect fair market values may price out some unprofitable commercial filmers, the size of the film crew is a factor in the size of the fee charged. *See* NPS, *About Us*, https://perma.cc/YF3H-TRNY. Similarly, requiring commercial filmers to apply for a permit appropriately allows the government to assess the proposed location for particular risks and determine which actions might be necessary to mitigate those risks. Although large film crews are most likely to be a source of harmful impacts on federal lands, even small-scale activities can pose challenges that the government must manage, particularly in wilderness. Land managers often need to know the specific time and location of a filmer's activities, and permit terms and conditions may be used to manage the activity and to mitigate the possibility of resource damage or impact to visitors. *See* 78 Fed. Reg. at 52,090. The Ninth Circuit has previously recognized in similar circumstances that applying permit requirements to even small instances of expressive activity can materially advance the government's legitimate interests in protecting priceless resources and other visitors. *See Kaahumanu*,

---

[3] The government's resource-protection interests also supports the imposition of a fee requirement: The absence of fees on federal lands would draw commercial filmmakers who would otherwise film in other locations, resulting in additional adverse impacts on the lands.

682 F.3d at 803 (permit requirement for three-person wedding on state beaches helped "minimize conflicting uses of limited beach area" and "conserve the physical resource of the beaches"); *see also Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks*, 864 F.3d 905, 916 (8th Cir. 2017) (no carve-out required for small-scale filming from ordinance banning commercial filming in parks). While BlueRibbon contends that the permit-requirement regulations are under-inclusive by failing to limit noncommercial filming activity that pose similar risks, BlueRibbon ignores the other regulatory provisions that apply to noncommercial filmers and serve to address the risks posed by their activities. *See, e.g.*, Decl. of Mark Chandler, Ex. 3, ¶ 5. And since the permit requirement for commercial filming materially advances the goal of avoiding harm to public lands, it is of no moment that a court may think that goal would be more effectively achieved with a broader or different permit requirement.

Finally, the commercial-filming regulations leave ample alternative channels open for groups like BlueRibbon. BlueRibbon characterizes the commercial-filming regulations as "an absolute prohibition" on its expression, Pl.'s Br. at 17, but that is exaggeration. "[T]he scope of [a speaker's] request cannot define the available 'channels of communication,'" *Mahoney v. Doe*, 642 F.3d 1112, 1119 (D.C. Cir. 2011), and the ample-alternatives requirement does not create a loophole by which lawful, narrowly-tailored permit requirements must be set aside so that people may engage in the exact same conduct without a permit. BlueRibbon generally is free to create the films and messages it wishes to create noncommercially, just as it is free to create those same films and messages commercially outside federal lands, or to do so on public lands while paying a reasonable fee and obtaining authorization. Those channels satisfy the First Amendment. *See Price*, 45 F.4th at 1074.

## II.    The Equitable Factors Weigh Against Injunctive Relief.

The remaining preliminary injunction factors counsel against relief. BlueRibbon's irreparable-harm argument collapses into the merits: it contends that the government action violates the First

Amendment, and thus is *per se* unconstitutional. *See* Pl.'s Br, at 20 (citing, *e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976)). As explained *supra*, there is no constitutional violation. But, in any event, BlueRibbon's presumption sidesteps the analysis. "It is not enough to 'merely allege a violation of freedom of expression in order to satisfy the irreparable injury prong." *Ateba v. Jean-Pierre*, 2023 WL 5748567, at *5 (D.D.C. Sept. 6, 2023) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006)). Rather, "[a] plaintiff 'must show that their First Amendment interests are either threatened or in fact being impaired at the time relief is sought. When speech is not directly curtailed, a plaintiff must 'demonstrate that the allegedly impermissible government action would chill allowable individual conduct.'" *Id.* (quoting *Chaplaincy*, 454 F.3d at 301).

BlueRibbon's speech is not directly curtailed—it is free to speak about any topic. It is merely subject to permitting requirements, and in some contexts, a small fee. The National Park Service, for example, charges no location fee for commercial filming of 1-to-2 people with a camera and tripod only. Permittees still need to pay an application fee. *See* NPS, *About Us*, https://perma.cc/YF3H-TRNY. BlueRibbon and its members claim that they cannot afford these fees (which, again, are often nominal or zero), and in some contexts, may not secure a permit to film in the time desired. *See* Pl.'s Br. at 6–7. But injuries that can be remedied by money—such as the refund of fees—are a classic example where irreparable harm is *not* present. *E.g.*, *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 534 F.2d 1197, 1202 (9th Cir. 1980). And while some BlueRibbon members state that they fear a "specter of enforcement," Pl.'s Br. at 8, that does not establish that the prospect of enforcement is actual and imminent. These allegations cannot suffice for the required irreparable harm showing.

Nor does BlueRibbon show that an injunction is in the public interest. BlueRibbon would prohibit any implementation of the regulations on public lands, regardless of the environmental impact on those lands or the impact that filming will have on other users. *See, e.g.*, 78 Fed. Reg. at 52,090.

While construction of an alternate regime is possible, precluding implementation of the regulations now—and opening up federal lands to greater impacts in the meantime—is not in the public interest.

## III.     Plaintiff's Requested Relief Is Overbroad

Even if the Court were to reject all of Defendants' arguments above, it still should not grant the relief BlueRibbon seeks. In a case challenging federal regulations, a court may award preliminary injunctive relief only as to those regulatory provisions that the court finds are likely to inflict irreparable harm on the plaintiff and are likely to be invalidated on the merits. *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 478 n.39 (5th Cir. 2020) (instructing that "the scope of injunctive relief is dictated by the extent of the violation established" (citation omitted)); *cf. Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 364 (6th Cir. 2022). BlueRibbon seeks to enjoin the *entire* regulatory regime governing commercial filming on public lands—in all contexts and for all people. Such an order would go far beyond BlueRibbon's claimed injury (which extends only to a certain type of filming in certain contexts) and would extend far beyond the rule that injunctive relief should go so far as to remedy plaintiffs' injuries, and no further. *See Georgia v. President of the United States*, 46 F.4th 1283, 1306–07 (11th Cir. 2022) (noting importance that "injunctive relief operate[] on specific parties" in cases challenging federal administrative actions); *see also Kentucky v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023). So even if it finds *some* preliminary relief appropriate, the Court should reject BlueRibbon's overbroad request and craft a narrower remedy "no more burdensome to [Defendants] than necessary to provide complete relief." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).

## CONCLUSION

The Court should deny BlueRibbon's motion for a preliminary injunction.

Dated: December 15, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Director, Federal Programs Branch

/s/ *Cody T. Knapp*
JOSEPH E. BORSON (Va. Bar No. 85519)
Senior Trial Counsel
CODY T. KNAPP (NY Bar No. 5715438)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 532-5663
Fax: (202) 616-8470
Email: cody.t.knapp@usdoj.gov

*Counsel for Defendants*