UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BLUERIBBON COALITION,<br><br>     Plaintiff,<br><br>v.<br><br>MERRICK GARLAND, in his official capacity as Attorney General of the United States; DEBRA A. HAALAND, in her official capacity as Secretary of the Interior; THOMAS J. VILSACK, in his official capacity as Secretary of Agriculture; TRACY SONTE-MANNING, in her official capacity as Director of the Bureau of Land Management; CHARLES F. SAMS III, in his official capacity as Director of the National Park Service; and RANDY MOORE, in his official capacity as Chief of the United States Forest Service,<br><br>     Defendants. | Case No. 4:23-cv-00505-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is Plaintiff BlueRibbon Coalition's ("BlueRibbon") Motion for Preliminary Injunction. Dkt. 2. Defendants oppose the motion. Dkt. 20. On March 28, 2024, the Court held oral argument and took the matter under advisement. Dkt. 27.

Upon review, and for the reasons set forth below, the Court GRANTS in PART and DENIES in PART BlueRibbon's Motion.

MEMORANDUM DECISION AND ORDER – 1

## II. BACKGROUND

### A. The Parties

BlueRibbon Coalition is an Idaho-based 501(c)(3) that has worked to protect access to public lands through litigation, advocacy, and educational initiatives since 1987. It is a membership-based organization, boasting thousands of members across all fifty states. A primary source of its revenue comes from monetized social media pages, solicitations, and ads associated with videos it's members film and publish. Many of BlueRibbon's videos are filmed on public lands with simple devices such as a smartphone or GoPro camera.

Defendants are the officials in charge of various federal agencies that manage federal lands in the United States. These agencies receive their authority from Congress and are tasked with administering and conserving land for public use and enjoyment. These agencies also have a directive to "receive fair market value of the use of the public lands and their resources." 43 U.S.C. § 1701(a)(9); *see also* 31 U.S.C. § 9701.

### B. Statutory Background and Permitting Regime

In 2000, Congress passed, and President Bill Clinton signed, Public Law 106-206, which set forth the fee and permit regime BlueRibbon now challenges. The law has since been split into two statutes: one governing lands controlled by the National Park Service ("NPS"); the other governing lands controlled by the Bureau of Land Management ("BLM") and United States Forest Service ("USFS").

These two statutes (which are identical in all material respects) outline a permit and fee process for anyone wishing to film on public lands. For simplicity, the Court will reference only the NPS provisions in this order. However, this decision applies to NPS

MEMORANDUM DECISION AND ORDER – 2

provisions as well as BLM/USFS provisions.

By statute, the Secretary of the Interior must "require a permit and shall establish a reasonable fee for commercial filming activities" on land administered by the NPS. 54 U.S.C. § 100905(a)(1). In keeping with this mandate, the implementing regulations state that "[a]ll commercial filming requires a permit," and that the NPS will require a reasonable location fee assessed in accordance with a fee schedule published in the Federal Register. 43 C.F.R. §§ 5.2(a), 5.8(a)(1), (3).

The applicable regulations define "commercial filming" as "the film, electronic, magnetic, digital, or other recording of a moving image by a person, business, or other entity for a market audience with the intent of generating income." *Id*. at § 5.12. Although some news-gathering activities fit within this definition, the regulations generally exempt news organizations from the permitting and fee requirements. *Id*. at § 5.4.

The regulations also specify that a permit could be denied if, among other reasons, it is likely an activity would: "(a) cause resource damage; (b) [u]nreasonably disrupt or conflict with the public's use and enjoyment of the site; (c) [p]ose health or safety risks to the public; [or] (d) [r]esult in unacceptable impacts or impairment to National Park Service resources or values." *Id.* at § 5.5.

The location fee, which must be calculated to "provide a fair return to the United States," is based upon "the number of days of the filming activity," "the size of the film crew," "the amount and type of equipment present," and any "other factors . . . the Secretary considers necessary." 54 U.S.C. § 100905(a)(1)–(2). In addition to the location fee, the Secretary must recover "any costs incurred as a result of filming activities[.]" *Id*. at

100905(b).

A person convicted of engaging in commercial filming without obtaining a permit or paying the requisite fees faces a monetary fine and up to six months in prison. *See* 18 U.S.C. § 1865(a); 36 C.F.R. § 1.3, 5.5(a).

**C. Prior Litigation**

In 2019, a plaintiff brought a suit against the NPS's commercial-filming regulations, arguing that "the permit-and-fee requirements are facially unconstitutional under the First Amendment to the Constitution of the United States." *Price v. Garland*, 45 F.4th 1059, 1064 (D.C. Cir. 2022), *cert. denied* 143 S. Ct. 2432 (2023). While a district court originally sided with the plaintiff and found the regulations were not reasonable or content-neutral, the D.C. Circuit reversed. The Circuit Court concluded the commercial filming regulations were subject to a reasonableness standard, i.e., that "[t]he restriction must not discriminate against speech on the basis of viewpoint, and the restriction must be reasonable in light of the purpose served by the forum." *Id*. at 1072 (cleaned up). The Circuit ultimately held that the regulations met this standard.

With respect to the land-use fee requirement, the D.C. Circuit "ha[d] no difficulty rejecting [plaintiff's] contention that the location fee violates" the Constitution, since "[t]he fee requirement merely puts a commercial filmmaker on the same footing as any other person who uses park land for a commercial purpose, such as a concessionaire." *Id*. at 1073.

And with respect to the permitting requirement, that court similarly concluded that "[p]rotecting and properly managing park lands are undoubtedly significant governmental interests[.]" *Id*. Finally, the D.C. Circuit also rejected an argument that the "special

treatment the NPS regulations afford to 'news-gathering activities' amounts to an impermissible content-based distinction." *Id*. at 1075. Rather, it held that, "[t]he favorable treatment of news-gathering is but an example of the unremarkable practice of the Congress 'sometimes granting the press special privileges and immunities.'" *Id*. (quoting *Associated Press v. FCC*, 452 F.2d 1290, 1298 (D.C. Cir. 1971)).

### D. Procedural History

On November 15, 2023, BlueRibbon filed the instant lawsuit alleging a single cause of action: that the fee and permitting regime violates the First Amendment. Dkt. 1, at 30–42. That same day, BlueRibbon filed a Motion for Preliminary Injunction asking the Court to enjoin the relevant regulations pending the outcome of this litigation. Dkt. 2.

The Court extended the briefing schedule at the parties' request (Dkt. 16) and also allowed the Center for American Liberty the opportunity to file an amicus brief in support of BlueRibbon (Dkts. 12, 23).

On March 28, 2024, the Court held oral argument on BlueRibbon's Motion and took the matter under advisement. It now issues the following decision.

### III. LEGAL STANDARD

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22, (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) likely irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities weighs in favor of an injunction; and (4) that an injunction is in the public

interest. *Winter*, 555 U.S. at 20.

In the First Amendment context, this standard involves "an inherent tension" because the moving party "bears the burden of showing likely success on the merits—a high burden if the injunction changes the status quo before trial—and yet within that merits determination the government bears the burden of justifying its speech-restrictive law." *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014) (cleaned up).

The Ninth Circuit has resolved this tension by requiring the moving party to make an initial showing of "a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Id*. (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011)). Additionally, "[w]here, as here, the party opposing injunctive relief is a government entity, the third and fourth factors—the balance of equities and the public interest—merge." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. Of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (cleaned up).

## IV. DISCUSSION

As noted, BlueRibbon brings a single cause of action in this lawsuit. It alleges Defendants are violating its members' First Amendment rights because the fee and permitting regime places an unconstitutional restraint on their speech. Before analyzing the traditional *Winter* factors, the Court will discuss certain preliminary issues. First, the type of challenge at issue in this case. Second, whether BlueRibbon's activities are speech at all. And third, the applicable forum: public or nonpublic, and—depending on the answer to that question—what level of scrutiny the Court must apply in evaluating whether the

Defendant's regulations are constitutional.

### A. Applicability of Facial Challenge

In this case, BlueRibbon brings a facial challenge to Defendant's entire permitting regime. Dkt. 1, at 43; Dkt. 2-1, at 18.

"A facial challenge is a challenge to an entire legislative enactment or provision." *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (citing *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998)). This type of challenge presents an extremely high bar because a plaintiff must show that the statute is unconstitutional in all possible applications. *Diaz v. Paterson*, 547 F.3d 88, 101 (2d Cir. 2008). Generally speaking, facial challenges are disfavored because they short circuit the democratic process of evaluating a law and how, or under what circumstances, it can be constitutionally implemented.

Defendants allege BlueRibbon's facial challenge is untenable because there are millions of acres of public lands that lie outside any public forum where the permitting scheme can be constitutionally applied.

BlueRibbon, however, counters that a facial challenge is the only way to seek relief because the permitting structure is a prior restraint aimed at specific expressive conduct—speech—and limiting relief to one circumstance or one party would not serve the ends of justice. Dkt. 22, at 12–13.

The Court understands both parties' positions.

As Defendants note, this Country's national parks cover vast areas of wilderness and much of that may likely go untouched for decades. Thus, there are obvious areas of

land where Defendant's regime is plainly legitimate and can be constitutionally applied.[1]

Defendants also point out that, while there is a limited exception to the general rule

regarding facial challenges in the First Amendment context—to avoid deterring or chilling

speech—a plaintiff must still "demonstrate[] that the statute prohibits a substantial amount

of protected speech relative to its plainly legitimate sweep." *United States v. Hansen*, 599

U.S. 762, 770 (2023) (cleaned up). "Because it destroys some good along with the bad,

invalidation for overbreadth is strong medicine that is not to be casually employed . . . ."

*Id*.

But the Court is also persuaded by BlueRibbon's caselaw—particularly from the

Ninth Circuit—establishing that permitting schemes which allow officials discretion to

grant or deny permits based on the content[2] of the activity can be facially challenged

because they inherently call into question expressive conduct. *See, e.g., Spirit of Aloha

Temple v. Cnty. of Maui*, 49 F.4th 1180, 1191 (9th Cir. 2022); *Kaahumanu v. Hawaiʻi*, 682

F.3d 789, 802 (9th Cir. 2012).

Candidly, the applicability of a facial challenge in this context is a close call. But

ultimately, "[t]he label is not what matters." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194

(2010) (acknowledging that plaintiffs' claim had characteristics of both an as-applied and

---

[1] Arguably, however, this example folds in on itself because people will not bring challenges in relation to areas where they do not frequent. So, the regulation is constitutionally valid in those areas, but maybe for no other reason than nobody has (or ever will) visit that area and engage in commercial filming.

[2] As will be discussed below, whether Defendants base permitting decisions on content is the primary disagreement between the parties in this case. For its part, the Court is not fully convinced that content plays a role in the officials' decision-making process. Nevertheless, the fact remains that officials have discretion and BlueRibbon has presented serious questions about Defendant's process. That leans towards a facial challenge.

facial challenge). What matters is whether the "claim and the relief that would follow . . . reach beyond the particular circumstances of the[] plaintiffs." *Id.* In other words, the distinction between the two types of challenges mainly goes to the breadth of the remedy.

If the Court were to ultimately side with BlueRibbon and find the permitting regime unconstitutional, it would not be invalidating the applicable provisions only as applied to BlueRibbon. It would be finding the regime unconstitutional on the whole. That result would naturally apply to everyone. Thus, the Court finds a facial challenge is, in fact, the best fit for BlueRibbon's claim under the circumstances.

That said, at this stage of the case, the Court must decide how wide to cast the preliminary injunction net, if it casts that net at all. In doing so, the Court is cognizant of the United States Supreme Court's recent admonition regarding the breadth of injunctions. *See generally Labrador v. Poe*, 144 S. Ct. 921 (2024). There, the Supreme Court advised that lower courts should tailor any emergency action to the parties who brought the suit. *See Poe*, 144 S. Ct. at 923. Thus, while a facial challenge this may be, the Court's resolution of today's motion must, necessarily, be confined to BlueRibbon—the party bringing the challenge. More on this later.

## B. BlueRibbon's Speech

One of the difficulties of this case is determining whether the conduct BlueRibbon wants to engage in qualifies as protected speech in the first instance. This is important in helping determine the applicable forum and relevant level of scrutiny the Court should employ.

Defendants argue the speech BlueRibbon seeks to protect does not fit cleanly into

the traditional "constitutional speech" bucket. It encourages the Court to follow the D.C. Circuit's observation that, while the act of filming likely warrants "solicitude under the First Amendment, that solicitude does not come from the speech-protective rules of a public forum." *Price*, 45 F.4th at 1068. Defendants contend that BlueRibbon does not seek access to public lands to actually "communicate" with other members of the public in those public locations. Dkt. 20, at 17. What BlueRibbon does, is use those public lands as the backdrop for expressive content it publishes in online forums such as Instagram, YouTube, and Facebook *at a later point in time*. Said another way, Defendants believe BlueRibbon does not participate in the traditional "communicative activities" that have historically been protected in public forums. From Defendants' perspective, recording a video—like writing a book or painting a picture—is not itself a communicative activity; it is part of the creative process that will be communicated at a later time and in a different place, and there is no historical right of access to government property to *create* speech.

BlueRibbon counters that the Ninth Circuit has squarely answered this question and came to the opposite conclusion of the D.C. Circuit. In *Animal Legal Def. Fund v. Wasden*—among other cases—the Ninth Circuit observed that, "[i]t defies common sense to disaggregate the creation of the video from the video or audio recording itself. The act of recording is itself an inherently expressive activity . . . ." 878 F.3d 1184, 1203 (9th Cir. 2018). *See also*, *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010) (holding that "neither the Supreme Court nor [the Ninth Circuit] has ever drawn a distinction between the process of creating a form of *pure* speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First

MEMORANDUM DECISION AND ORDER – 10

Amendment protection afforded").

In sum, Defendants argue First Amendment protections apply only once already-created speech—be it a painting, a book, or a video—is being communicated to others. BlueRibbon, on the other hand, contends that the First Amendment protects speech from creation through dissemination.

The Court tends to agree with BlueRibbon for precedential reasons and on the merits of its logic. The Ninth Circuit has spoken on this issue and ultimately held that, "[b]ecause the recording process is itself expressive and is inextricably intertwined with the resulting recording, the creation of audiovisual recordings is speech entitled to First Amendment protection as purely expressive activity." *Wasden*, 878 F.3d at 1204 (cleaned up). Further, there is often no way to divorce the "creation" aspect—the actual filming, lighting, angle, content, tone, etc.—from the "communication" aspect—the publication or dissemination to a viewing audience. This is particularly true where the two occur simultaneously (e.g. in a live stream). But even if the filming occurs first, is later edited, and *then* published, it is difficult to argue that the creation aspect is not protected under the First Amendment, but the publishing aspect is, because without the creation, no publication would be possible.

Having determined that BlueRibbon's activity warrants protection under the First Amendment, the Court still must determine the type of forum in which its members' communications take place and, in turn, the level of scrutiny that must be applied.

## C. Forum and Level of Scrutiny

The standard the Court will use to determine whether Defendant's permitting scheme violates the First Amendment depends on the nature of the forum at issue. *See*

*Good News Club v. Milford Cent. Sch.,* 533 U.S. 98, 106 (2001). The Supreme Court has divided public forums into three categories: "traditional public forums," "designated public forums," and "limited public forums." *Christian Legal Soc'y v. Martinez,* 561 U.S. 661, 679 n.11 (2010). The rest of government property is either a nonpublic forum or no forum at all. *Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 677 (1998).

In traditional public forums, such as public streets and parks, "any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest . . . ." *Pleasant Grove City v. Summum,* 555 U.S. 460, 469 (2009). A content-neutral restriction in a traditional public forum will be upheld if it is "narrowly tailored to serve a significant governmental interest" and it "leave[s] open ample alternative channels for communication of the information."[3] *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Designated public forums are created when "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." *Pleasant Grove*, 555 U.S. at 469–70. Speech restrictions in designated public forums—be they content-neutral or content-based—are subject to the same standards applied in traditional public forums. *See, e.g.*, *id.; Flint v. Dennison*, 488 F.3d 816, 830 (9th Cir. 2007).

Finally, governmental entities establish limited public forums by opening property

---

[3] A content-neutral restriction is a restriction that can be "justified without reference to the content of the regulated speech," like a time, place, or manner limitation on speech, or a volume limitation. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

"limited to use by certain groups or dedicated solely to the discussion of certain subjects."
*Pleasant Grove*, 555 U.S. at 470. "In such a forum, a governmental entity may impose
restrictions on speech that are reasonable and viewpoint-neutral." *Id.*

"Other government properties are either nonpublic for[ums] or not for[ums] at all."
*Forbes,* 523 U.S. at 677. In a nonpublic forum, as in limited public forums, speech
regulations must be "(1) reasonable in light of the purpose served by the forum and (2)
viewpoint neutral." *Ctr. for Bio-Ethical Reform, Inc. v. City & Cnty. of Honolulu,* 455 F.3d
910, 920 (9th Cir.2006) (cleaned up).

The parties dispute the nature of the forum in this case.

BlueRibbon argues the permitting regime "plainly regulates speech in public
forums" because, presumably, "at least some speech in at least some public forums" is
implicated here. Dkt. 2-1, at 16.

For its part, Defendants echo their comments about communicative speech and how
"forum principles are not appropriate" in this case. Dkt. 20, at 17. Even if the Court were
to consider the forum, Defendants asserts there are multiple forums at issue because "our
country's many national parks are too vast and variegated to be painted with a single brush
for purposes of forum analysis." *Id*. at 8 (citing *Oberwetter v. Hilliard*, 639 F.3d 545, 552
(D.C. Cir. 2011)).

The Court agrees with Defendants that a forum analysis is difficult in this case. In
fact, the Court is not prepared to make a determination as to the forum at this time. The
Court is hesitant to kick the can down the road, but based upon the record as it appears
today, it cannot make a well-informed decision on this critical and threshold question;

MEMORANDUM DECISION AND ORDER – 13

discovery from the parties is needed to flesh out where BlueRibbon (and others) tend to film and whether those locations have been designated as any type of forum in the past. *See, e.g., Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 515 (D.C. Cir. 2010) (noting that a forum analysis—about national parks no less—is a "fact-intensive question which cannot be answered in the absence of evidentiary submissions"). But the Court still needs to proceed in some fashion today.

Because the Court is allowing a facial challenge to proceed—that is to say, it is allowing a challenge to the entire statute—it must look to all applications of that statue. As alluded to, it appears there are legal and appropriate applications of Defendant's permitting regime where no public forum is at issue and no challenge will ever be brought (e.g. remote corners of the wilderness in the rocky mountains).[4] On the other hand, some federal lands were likely intended to be designated or limited public forums (e.g. the National Mall in Washington D.C. where public rallies are often held). At the very least, the Court rejects Defendants argument that this case does not involve at least *some* type of traditional or designated public forum in at least some instances.

But because the proper forum (or forums) is unclear, the Court cannot determine at this stage whether the Government's restrictions must be narrowly tailored to serve a compelling government interest, narrowly tailored to serve a significant government interest, or simply reasonable and viewpoint-neutral. Nevertheless, because it appears that

---

[4] The Court is not implying Defendants' permitting scheme is not likewise valid in other locations or in other forums as well. It is simply observing that, *at the very least*, there are lands where Defendant's permitting structure is easier to analyze.

at least some areas within some of the Country's national parks are traditional or designated public forums, the Court will analyze Defendants' restrictions under that heightened standard.

### D. Success on the Merits

The Court turns next to whether BlueRibbon has shown that it is likely to succeed on the merits of its claim to a sufficient degree that the Court should enjoin the law now while the litigation progresses. The Court finds BlueRibbon has met its burden and that a narrow injunction is warranted.

As mentioned above, the Court looks to whether BlueRibbon has pleaded "a colorable claim that its First Amendment rights have been infringed," and then to whether Defendants can justify the infringement. *Harris*, 772 F.3d at 570. And while the forum question is open at this point, because some traditional and/or designated public forums appear implicated here, the Court will analyze the regulations at issue under that framework. That is, the Court will first determine whether the regulations are content-based or content-neutral. If they are content-based, the Court will subject them to strict scrutiny. Otherwise, the Court will apply the more-relaxed, content-neutral scrutiny.

The parties' opinions on the question of content neutrality constitute arguably their biggest disagreement in this case.

"A regulation of speech is facially content based under the First Amendment if it 'targets speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed v. Town of*

*Gilbert*, 576 U.S. 155, 163 (2015)).

Defendants argue this is an easy call because the regulations at issue never mention anything about the content or context of any speech involved in the filmmaking. The regulations define commercial filming simply as filming "with the intent of generating income" from a "market audience." 43 C.F.R. § 5.12. The regulation, therefore, puts the emphasis on whether money is involved, not whether a certain type of speech is involved.

BlueRibbon contends the exact opposite: whether a permit is required turns on what is said in the film. Dkt. 22, at 7. Its main example in support of its position is the carve-out for news-gathering. As mentioned, the permitting structure (generally speaking) does not apply to the news media. Even if a video itself generates income and/or otherwise satisfies the "commercial filmmaking" label, news organizations are not required to have a permit to film that video. BlueRibbon contends this is a blatant example of content-based discrimination because Defendants must look at either: (1) the content of the speech to determine whether it is "news," and/or (2) the identity of the speaker to decide whether it is a news organization. Because of this, BlueRibbon contends Defendants impermissibly "single out specific subject matter for differential treatment." *Twitter, Inc. v. Garland,* 61 F.4th 686, 697 (9th Cir. 2023) (cleaned up).

BlueRibbon uses one of its members as a case-study. Nathan Riddle is a BlueRibbon member. He films videos on public lands to showcase people's stories and discuss the importance of motorized access to public lands. Nathan has monetized his videos by checking the ad-revenue box on Youtube (i.e. he receives a small portion of revenue every time his video is viewed). When the BLM contacted Nathan about his videos, he argued he

qualified for the news-gathering exception because he was cataloging and telling other peoples' stories. The BLM looked at the videos and determined he did not qualify for the exception. BlueRibbon claims "if that is not a content-based speech regulation, then nothing is." Dkt. 2-1, at 17.

It does appear that the BLM had to view Nathan's videos—including the content—to determine whether it would require him to obtain a permit. But that does not mean they were looking at the content itself, nor does it mean the regulation is content-based. The fact that someone from BLM viewed Nathan's videos to see whether he was really with a news organization—or was involved in "news-gathering activities" as contemplated in the statute—is not dispositive of the question of whether the regulation is content-neutral.[5]

In fact, while BlueRibbon implies the BLM's actions with Nathan are some sort of smoking gun, the argument cuts the other way to some degree. If the BLM was basing its regulation on content, it would be screening known news organizations' videos as well to make sure their content was news-worthy. But there is no evidence that this is being done. The regulations simply exempt news media entitles, period. *See* 43 C.F.C. §§ 5.4, 5.12. Thus, the content might be irrelevant. But this cuts back in BlueRibbon's favor because it suggests the distinction is not content-based at all but based exclusively on the speaker's

---

[5] To be fair—assuming the allegation is true—if the BLM was looking at the *content* of Nathan's videos, that would undercut Defendants' argument that the regulation is content-neutral. It should have simply googled Nathan Riddle to see if he was with a news organization. The Court can only assume, however, that the BLM did something of that nature, and, finding Nathan was not with any known news organization, decided to investigate further by viewing his videos. Maybe Defendants should have just said he did not qualify once they determined he was not with any news organization. But *maybe* they were trying to help Nathan by watching his videos to see if he, nevertheless, could qualify for an exemption. The Court is speculating, and discovery will flesh these issues out. But the Court's point is the BLM's actions may not be as menacing as BlueRibbon posits.

identity. Could Nathan's videos be newsworthy? Quite possibly. But again, that is irrelevant because he is not part of the news media as statutorily defined.[6]

In other words, the exception supports Defendant's conclusion. For all intents and purposes, it does not matter what the news organization is talking about in its videos, it is exempt. The Court will get to the legality of the exception momentarily, but the fact that the exception for news organizations is based upon the "speaker" and not the "content,"[7] illustrates that the regulation is not based so much on the message expressed, but the person making the message.[8]

Thus, "content"—at least in the normal sense of the word—does not appear to be a relevant distinction in this case. This aside, Defendants admit that the permitting regime distinguishes on the basis of a speaker's identity. And that itself is a problem.

---

[6] This gets into a sub-argument BlueRibbon puts forth. The definition of "representative of the news media" is "any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 43 C.F.R. § 5.12. It argues Nathan does exactly that. He makes videos. They are of interest to the public. He edits those videos. And he distributes them to an audience. But, as explained in the following footnote, he is not actually part of any news organization by definition. This is a critical distinction.

[7] The regulations outline that "news" is defined as "information that is about current events or that would be of current interest to the public . . . ." 43 C.F.R. § 5.12. Frankly, just about anything could qualify under this definition. Afterall, people are interested in all sorts of things. But the qualifier is important. It is information about current events and of interest to the public gathered "by news-media entities." *Id.* Thus, while anyone can record things that are potentially news-worthy and interesting, that does not matter unless he or she is associated with a news media entity. BlueRibbon argues some of its members are not part of any official news media organization but could seemingly qualify under the statute (as individuals) because they are reporting news-worthy topics. These efforts, however, begin to swallow the definitions and the Court is not willing to be that creative with the rather straight-forward language of the statute.

[8] BlueRibbon separately argues the permitting regime's commercial filming restriction on "income-generating speech" is also a content-based restriction. BlueRibbon reiterates that someone must look at the *content* of any film to determine whether it will go to audiences with the intent to generate income. But this is not entirely true. Yes, officials *may* need to review footage to see if it was shot on public land, who the target audience is, and/or how (if at all) it is being monetized. But the content of the video itself is largely irrelevant. Furthermore, "monetized" film is not a genre and has no particular content, so this argument does not fit well within the framework of the statute.

The Supreme Court and the Ninth Circuit have repeatedly cautioned that "speaker-based regulations 'are all too often' content-based regulations in disguise." *Boyer v. City of Simi Valley*, 978 F.3d 618, 621 (9th Cir. 2020) (*quoting Reed*, 576 U.S. at 170). Accordingly, "when a regulation makes speaker-based distinctions, we ask whether that speaker preference reflects a content preference. If it does, we treat it the same as any other content-based regulation and apply strict scrutiny." *Id*. (cleaned up).

Here again, the answer is not clear. For example, imagine that a news organization and a member of BlueRibbon are both filming the same event (e.g. Old Faithful in Yellowstone National Park), that event is news-worthy, and both intend to put said footage online where it will generate money via ad revenue. BlueRibbon would need a permit to film; the news organization would not. Thus, the operative distinction is not just the location and the content, but also the speaker's identity.

This dovetails into the legitimacy of the exception itself. BlueRibbon contends that a carve-out for news organizations favors one sort of speech and/or speaker over another and is content-based. Again, this is not quite true under the traditional understanding of "content." It is true the material produced must be newsworthy, but—practically by definition—if a news media organization is producing content, it is newsworthy. More importantly, however, the news media have (for better or worse) been granted special status over the years. The regulations at issue here are modeled after the Freedom of Information Act and provisions therein that allow for a lower fee for "representative[s] of the news media." 5 U.S.C. § 552(a)(4)(A)(ii)(II)–(III). There is no dispute that the news media receives favorable treatment under Defendants' permitting regime, but such is consistent

with "the unremarkable practice of the Congress 'sometimes grant[ing] the press special privileges and immunities.'" *Price*, 45 F.4th at 1075 (citing *Associated Press v. F.C.C.*, 452 F.2d 1290, 1298 (D.C. Cir. 1971)).

While granting the news media special privileges is not unheard of in American jurisprudence, the fact remains that such privileges require enforcement officers to treat some speakers differently than others. The Court will postpone final judgment on whether this differentiation reflects a content preference (in addition to a speaker preference) until after discovery. But for now, the Court can see no reason to grant news organizations special privileges outside of a belief that the content produced by these organizations is somehow superior to, or of greater importance than, other content. In other words, this speaker-based distinction appears to reflect a content-based preference, making strict scrutiny appropriate. *See Boyer*, 978 F.3d at 619.

Next then, the Court looks to whether Defendants' regulations are narrowly tailored to serve a compelling government interest.

Taking the two criteria up in reverse order, the Court notes that Defendants' interest in: (1) ensuring that filming activities do not harm federal resources or interfere with visitors to federal lands, *see* 54 U.S.C. § 100905(d); and (2) raising money to maintain and improve public land for the benefit of all, *see* 54 U.S.C. § 100905(a),(e) are likely compelling. *See Boardley*, 615 F.3d at 519; *Price v. Garland*, 45 F.4th at 1073. And, generally speaking, the method Defendants chose to accomplish those goals—via a fee and permit structure—is understandable.

For example, fees are commonplace on federal lands. "[W]hen the [government]

acts as a proprietor, reasonable regulations may include profit-conscious fees for access for expressive conduct, in a manner similar to fees that would [be] charged if the forum was owned by a private party." *Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1309 (11th Cir. 2003). So too with permits. That Defendants require a permit to film on public lands is rather unremarkable.

And the distinction between commercial and non-commercial filming is a legitimate distinction to make. While there are assuredly smaller-scale operations (like BlueRibbon) that are caught up in the permitting requirements that might not otherwise need to be included, the general assumption that commercial filming requires more equipment and more people, and thus results in more damage, is reasonable. Thus, to require fees and permits for this type of activity fits squarely within Defendants' mandate to ensure public lands remain viable for future generations and generate nominal income.

The problem, however, is the fair application of that structure and the carve-out for news-gathering organizations. It is as if the Defendants are saying they want to preserve and protect public lands (and receive a small fee for doing so) *unless* you are a specific type of person; then it doesn't matter. Granting the news certain privileges may be permissible, but those privileges cannot overshadow the constitutional rights of others.

BlueRibbon has shown a likelihood of success on the merits of its First Amendment claim because it has persuasively argued that Defendants' regulations suffer from content-based discrimination in light of a speaker-based distinction. Additionally, while Defendants have compelling reasons for the restrictions that make up its fee and permitting regime, it is questionable whether its methods are sufficiently tailored to those reasons

(again, considering the exemption for news media).

### E. Remaining *Winter* Factors.

While the merits-based prong is typically viewed as the most important element of a preliminary injunction*, see Disney Enters., Inc. v. VidAngel, Inc*., 869 F.3d 848, 856 (9th Cir. 2017), the issue of irreparable harm is also important. BlueRibbon does not discuss this factor in detail other than to say that the loss of First Amendment freedoms is a harm. Dkt. 2-1, at 26. Defendants argue any harm here is easily repairable because they can simply return any fees charged to BlueRibbon should the Court find its permitting regime invalid. But the fact remains that BlueRibbon is "self-censoring" its First Amendment right to free speech out of fear of prosecution by Defendants. The Court agrees this cut in favor of BlueRibbon.

Under Ninth Circuit caselaw, "a party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (cleaned up); *see also Harris*, 772 F.3d at 583. This is because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 828 (9th Cir. 2013) (cleaned up). Here, BlueRibbon has demonstrated the existence of a colorable First Amendment claim based upon the speaker/content distinction at play and is suffering injury because its members have avoided engaging in speech for fear they will incur fines or further restrictions.

And as is typically the case, neither party discussed the remaining factors—balance

of equities and public interest—in detail. Both simply argue their side prevails on the third and fourth prongs considering their respective success on the first prong. The Court agrees the public has an interest in this issue and that interest is significant on both sides. These factors are roughly even.

## V. CONCLUSION

This is a difficult case.

Defendant's regulations appear to be content neutral at first blush. That said, the speaker-based distinction in the regulations bleeds into a question about content that is quite concerning to the Court. Additionally, the structure Defendants have employed to meet their stated interests may not be sufficiently tailored to pass muster—compelling though those interests may be. At the very least, BlueRibbon has presented "serious questions"[9] going to the merits of its claim. The fact that the Court itself has so many questions and concerns illustrates this point. Discovery is needed to expound upon Defendant's process and how it is implemented between various speakers (among other topics). Discovery is also needed to develop a proper forum analysis for the Court to utilize.

The Court is not, however, willing to enjoin—even preliminarily—an *entire* federal statute for the *entire* United States when it has so many unanswered questions and there appear to be certain valid and legal applications of Defendant's permitting regime. Thus,

---

[9] Under the "serious questions" version of the preliminary injunction test, the Court can issue an injunction "when a plaintiff demonstrates that 'serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.'" *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir.2011)). BlueRibbon has brought a serious question before the Court and because that question involves a First Amendment freedom, the balance tips in its favor.

at this preliminary stage, the Court will not enjoin the law entirely, but only as applied to BlueRibbon. *See Poe*, 144 S. Ct. at 927–28.

## VI. ORDER

Now, therefore, **IT IS HEREBY ORDERED**:

1. BlueRibbon's Motion for Preliminary Injunction (Dkt. 2) is GRANTED in PART and DENIED in PART as outlined above. The regulations are preliminarily enjoined as applied to BlueRibbon, but remain in full force and effect for all other parties.

2. In accordance with the Court's prior order (Dkt. 16), the Court will wait to hear from the parties regarding next steps (such as commencing discovery).

DATED: June 20, 2024

David C. Nye
Chief U.S. District Court Judge